[No. 21856. Department One. August 5, 1929.]

GEORGE A. ROBINSON, *Appellant*, v. SILVER LAKE RAIL-
WAY & LUMBER COMPANY, *Respondent*.[1]

[1]Reported in 279 Pac. 1109.

262

*Forney & Ponder* and *J. N. Pearcy*, for appellant.
*Fisk & McCarthy*, for respondent.

PARKER, J.—The plaintiff, Robinson, seeks recovery of damages from the defendant railway and lumber company. Robinson's first cause of action is rested upon the theory of damages suffered by him as the result of the company's negligently failing to catch and hold, in its sheer log boom in the Cowlitz river, downstream floating logs belonging to him, in violation of its public service duty owing to him in pursuance of his request for such service; and, in substance, in the alternative, upon the theory of such negligence being in violation of the company's contract duty owing to him, even apart from the question of its public service duty, in event it be held not liable in law to render such service as a public service.

Robinson's second cause of action is rested upon the theory of damages suffered by him as the result of the company's selling, on his account, certain logs belonging to him, which were caught in its boom, at a price materially less than their market value, and accounting to him therefor only for the amount of such sales less its charge for rafting the logs so sold.

The company's defense to Robinson's first cause of action is, in substance, that it is not a public service corporation and did not owe him any duty as such; that it did not in any event owe him any contractual duty; that he suffered no actual damage; and that recovery for a large part of the damage, if any was suffered by him, is barred by the statute of limitations. The company's defense to Robinson's second cause of action is a denial of its failure to fairly account for his logs sold by it, and also a settlement with him amounting to full accord and satisfaction.

The case proceeded to trial in the superior court for Cowlitz county, sitting with a jury; both causes of action being treated by counsel upon both sides as being triable by a jury. At the conclusion of the introduction of evidence in behalf of Robinson, counsel for the company moved for dismissal of both causes of action upon the ground of the evidence being insufficient to sustain any recovery by Robinson. This motion was by the trial court sustained, and a formal order, in effect a final judgment with prejudice, entered accordingly. From this disposition of the case in the superior court, Robinson has appealed to this court.

The evidence, we think, would warrant a jury in viewing the main facts of the case to be in substance as follows: Respondent railway and lumber company was duly incorporated under the laws of this state in June, 1903. Among the numerous objects and powers specified in its original articles of incorporation, are the following:

"(4) To exercise the right of eminent domain in carrying out any or all of the objects enumerated in these articles."

"(12) To build, construct, purchase, lease, possess, own or otherwise acquire, wharves, piers, booms, . . . and to maintain and operate the same."

These original articles remained unchanged until March, 1921, when the enumeration of objects and powers therein was amended by the company by omitting therefrom the eminent domain provision above quoted, and by substituting in lieu of paragraph 12, above quoted, the following:

"To construct, maintain and operate private booms for the booming, rafting and sorting of logs and other timber products belonging to the corporation."

Respondent has, for many years, maintained in the Cowlitz river, at a location called Rocky Point, some two miles above the city of Kelso and some five miles above the mouth of that river where it flows into the Columbia river, a sheer log boom for the catching, storing and rafting of logs. We may concede, for present purposes, that, of the many millions of feet of logs caught and rafted in the company's boom, the larger portion has been the company's own logs. However, many million feet of logs have been caught and rafted in the company's boom for others at frequent intervals ever since the construction of the boom by the company, and toll charges collected by the company for such service from the respective owners of such logs.

Just when respondent constructed its boom is not made plain by the evidence, but the conclusion therefrom is warranted that it was constructed and has been operated by the company in the manner above noticed since long prior to the amendment to its articles of incorporation in 1921. The boom is some 8,000 feet long, and lies in navigable water of the river adjacent to the river bank, its outer boundary averaging some 25 feet from the bank and marked by a row of piles driven in the bed of the river, and boom sticks floating alongside the piles. Constituting an appliance of, and part of, the boom, there are the usual

sheer boom sticks for sheering downstream floating logs into the boom. Thus is closed the whole channel of the river, but which is capable of being opened as may be required from time to time to facilitate navigation of the river. The river is wholly within the state of Washington, and is navigable for a distance of a few miles above respondent's boom, though its navigability there is somewhat limited except as furnishing a water highway for the driving and floating of logs, it being suitable for that purpose for a distance of some eighty miles above the company's boom. There is no other sheer boom in the river below respondent's boom.

In the year 1924, appellant Robinson was logging at various locations adjacent to the river above the company's boom, some of his logging operations being fifty miles or more above the boom. During that year, at these several places of his operation, he placed in the river a total of some five million feet of logs, with the view of driving and floating them down the river, and marketing them in the neighborhood of Kelso. On October 11, 1924, Robinson wrote a letter to the company requesting that his logs, as they came down the river, be caught and rafted by the company in its boom. The company received and answered this letter on October 13, 1924, protesting that it could not raft his logs without boom sticks, evidently meaning without Robinson's furnishing boom sticks therefor. Robinson's logs began to arrive at the company's boom in January, 1925. The company then commenced catching and rafting them, but, because, as it claimed, Robinson's logs arrived too slowly as to quantity, it was not practical to raft them in separate rafts, and it therefore became necessary to put them in rafts with its own logs and sell them with such other logs. This Robinson consented might be done. The company commenced accounting to Robinson on January 31, 1925,

for such disposal of his logs. This was repeatedly done and payments made by the company to Robinson, according to such accountings, up until June 30, 1927. The evidence warrants the conclusion that all logs belonging to Robinson, caught in the company's boom, were so disposed of.

During this period, Robinson repeatedly visited the company's office, following each flood period of the river, making inquiry as to the arrival of his logs, and was on such visits furnished with what then appeared to him to be correct information in that behalf. Robinson's logs, because of the varying long distances they had to come to reach the company's boom and the tortuous nature of the river, arrived at the company's boom in a somewhat straggling manner during the entire period from January, 1925, to December, 1927, being stranded upon the bars and caught in log jams, from which they were reclaimed and put into the river from time to time by the almost constant efforts of Robinson's employees during the flood periods of the river. Robinson's logs were all plainly marked by an appropriate brand known to the company, so they were readily identified as his logs upon their arrival at the company's boom. The evidence is not very certain as to any express request or requests made by Robinson to the company to catch and boom his logs as they came to its boom, other than by his letter of October 11, 1924, but the continued and repeated dealings between Robinson and the company from that time up until November, 1927, would amply warrant the jury in concluding that the company and Robinson regarded his request made in his letter of October 11, 1924, as a continuing request at all times here in question.

On November 18, 1927, the company sent to Robinson a telegram reading as follows:

"Owing to dangerous high water will open boom at Rocky Point tonight letting all drift and logs go down river."

On the following day, the company sent to Robinson another telegram, as follows:

"Boom full and river conditions such that we will be leaving sheer boom open at any time. Our boom is a private boom and we are under no legal obligation to catch logs except as provided in written contract."

This is the first claim communicated by the company to Robinson that it was not required to render boom service as a public service. About that time, a large amount of Robinson's logs was allowed by the company to pass its boom and become lost, the sheer being unnecessarily and negligently left open, as the jury might have concluded from the evidence. The evidence also warrants the conclusion, as the jury might have found, that, on other occasions, the sheer was unnecessarily and negligently left open and quantities of Robinson's logs allowed to pass and become lost.

Our statute relating to public service duties of boom companies maintaining sheer booms in navigable waters of the state, in so far as need be here noticed, referring to sections of Remington's Compiled Statutes, reads as follows:

"§ 8399. Any corporation heretofore or hereafter organized in the state of Washington for the purpose of catching, booming, sorting, rafting, and holding logs, lumber, or other timber products, shall have power to acquire, hold, use, and transfer all such real and personal property or estate, by lease or purchase, as shall be necessary for carrying on the business of said corporation.

"§ 8400. Any corporation hereafter organized for the purpose mentioned in the last preceding section, shall within ninety days after its articles of incorporation have been filed, proceed to file in the office of the

secretary of state a plat or survey of so much of the shore lines of the waters of the state and lands contiguous thereto as are proposed to be appropriated for said purpose by said corporation.

"§ 8401. Such corporations shall have power and are hereby authorized, in any of the waters of this state or the dividing waters thereof, to construct, maintain and use all necessary sheer or receiving booms, dolphins, piers, piles or other structure necessary or convenient for carrying on the business of such corporations: *Provided,* That such boom or booms, sheer booms or receiving booms shall be so constructed as to allow the free passage between any of such booms and the opposite shore for all boats, vessels or steam crafts of any kind whatsoever, or for ordinary purposes of navigation.

"§ 8402. After such works shall have been constructed, such corporation shall catch, hold and assort the logs and timber products of all persons requesting such service, upon the same terms and without discrimination; and shall have the right, in consideration of the convenience and security afforded to the public in the handling of logs and timber products, to charge and collect tolls on all logs or other timber products caught within their works and upon the order or request of the owner or owners thereof, and there assorted, boomed or rafted; said tolls shall not exceed seventy-five cents per thousand feet on logs, spars or other large timber, and reasonable rates on all other timber products; *Provided,* That it shall be the duty of any corporation operating a boom at the mouth of any river, to catch and hold, assort, boom and raft all logs and timber products, except such as may be already in charge of its owner or his agents, without request of the owner or owners, and shall have the right to charge and collect tolls not to exceed seventy-five cents per thousand feet for such service. The amount of logs or timber is to be board measure, to be ascertained by the usual legal method of scaling; and such corporation shall have a lien upon the logs and timber products for the driving, floating, booming, sorting and rafting thereof, and the right to enforce

such liens in any manner provided or that may be provided by law for the enforcement of liens upon personal property. Such corporation shall, as soon as practicable, deliver logs or other timber products caught within their booms, sorted and rafted ready for towing, to the owner or owners thereof, and if required to hold such property for more than thirty days, shall have the right to charge a reasonable rate for such storage for the period of excess.

"§ 8405. Corporations organized in accordance with the provisions of this act shall be liable to the owner or owners of logs or other timber products for all loss or damage resultant from neglect, carelessness, or unnecessary delay on the part of servants of such corporations: . . .

"§ 8406. In addition to such damages as are herein provided for, any corporation willfully neglecting to assort and deliver such logs and timber products according to the provisions of this act, it shall be liable to a fine not exceeding twenty per centum of the value of such property which it shall have failed to deliver, but no such corporation shall be liable to such damages or penalty if said owner or owners of such logs or timber products shall have failed to furnish the necessary boom sticks and chains to raft the same."

Section 8409 gives to boom companies the power of eminent domain to be exercised in acquiring shore land rights from private owners as may be necessary to facilitate their booming operations.

It is contended in behalf of the company that it was not organized as a public service boom company and never assumed any public service duty. True, its original articles of incorporation do not, in terms, specify, as one of its numerous specified objects and powers, to maintain and operate booms as a public service, but it did specify therein, as one of its objects and powers, "to exercise the right of eminent domain in carrying out any or all of its objects enumerated in these articles." This strongly suggests an intent to

exercise the company's eminent domain power to whatever extent might become necessary to facilitate the exercise of any of its specified objects and powers which might become a public service. The maintenance of a boom may become a public service, as plainly appears from our statutory provisions above quoted. So we think it plain that the company could become a public service boom company, and be within its corporate powers.

Did the company become a public service corporation, judged by what it actually did in the maintenance of its boom? It appropriated its location, and constructed and maintained its boom thereon, thus occupying the navigable waters of the state, under its original articles of incorporation, in such manner that it must necessarily be subject to the obligations of public service imposed by the statutory provisions above quoted. The fact that it may never have exercised its eminent domain power; the fact that it may never have filed a plat of its appropriated location as required by the statute; and the fact that, in the maintenance of its boom, it may have rendered booming service to others, upon request, much less than for itself, we think of no consequence in our present inquiry, since, as we view it, the big, controlling fact remains that the company appropriated its location, built and maintained its boom thereon without any right so to do other than at the sufferance of the state, thereby, we think, voluntarily subjecting itself to all of the provisions of the above quoted statute, plainly requiring a company so maintaining a boom to render booming public service to the extent that lies reasonably within its physical power to render such service. The company cannot, we think, under these circumstances, be permitted to assert any non-compliance with the statute on its part as an excuse for avoiding

its public service duty, required by the statute, while so maintaining its boom.

We assume, for present purposes, that the public service duty which the company took upon itself by the construction and maintenance of its boom was, under the circumstances here shown, such that it could avoid such duty by abandoning its boom location and removing its boom therefrom; and that it was not obliged to continue the maintenance of its boom as rail common carriers and some other public service corporations have been required to do in such cases as *State ex rel. Grinsfelder v. Spokane Street R. Co.*, 19 Wash. 518, 53 Pac. 719, 67 Am. St. 739, 41 L. R. A. 515, and *Attorney General v. Haverhill Gaslight Co.*, 215 Mass. 394, 101 N. E. 1061. We conceive the applicable law to be as announced by Chief Justice Waite, speaking for the United States supreme court in the famous warehouse case of *Munn v. Illinois*, 94 U. S. 113, as follows:

"Looking, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only.' This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise De Portibus Maris, 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use he must submit to the control."

It is contended in behalf of the company that, in any event, when it amended its articles of incorporation in 1921, eliminating therefrom its original specified eminent domain purpose and power, and substituting a specified maintenance "private boom" purpose and power for its original specified maintenance "boom" purpose and power, it thereby ceased to be clothed with any public service duty or power to render such service with reference to the maintenance of its boom. It is possible that, if the company's original articles of incorporation had been as amended in 1921, it could be argued with some show of reason that the maintenance of its boom as a public service would be beyond its corporate power, though there are respectable holdings of the courts, in substance, to the effect that under the circumstances here shown the company would not be permitted to assert its want of corporate power in avoidance of its public service duty while holding and enjoying its boom location in the manner here shown. However, the company appropriated its boom location and constructed and maintained its boom thereon when it had the power to do so as a public service boom corporation. Can it, by mere amendment of its articles of incorporation, strip itself of its booming public service duty, at the same time continuing the maintenance of its boom in the navigable waters of the state, which it can do only as accompanied by booming public service duty under the statutory provisions above quoted? We are decidedly of the opinion that the company cannot escape that duty by mere amendment of its articles of incorporation. To accomplish that result it must go farther; that is, it must abandon its appropriated booming location and remove its boom therefrom. So we conclude upon this branch of the case that Robinson had a right to demand of the com-

pany, and have the company render to him, booming service as a public service.

■ Some contention is made in behalf of the company that it was, at all events, justified in refusing or neglecting to furnish to Robinson any greater amount of service than it did furnish him, because of his failure to furnish to it rafting boom sticks. We think it cannot be so decided as a matter of law. There is some evidence that Robinson, or another for him, rendered boom sticks available to the company if needed in rafting his logs. In any event, it does not appear but that Robinson would have furnished all necessary rafting boom sticks, had his logs been caught in the company's boom in such quantities, from time to time, so that his boom sticks would be needed in making up separate rafts of his logs. In this connection, it is to be noted that the negligence claimed by Robinson for which the company is liable, was letting his logs pass by, not through, its boom.

■ So far, we have proceeded upon the theory that the company's appropriated location of its boom belongs to the state and is subject to control of the state in so far as such control does not interfere with interstate or foreign commerce regulations of the Federal government; and that the company cannot appropriate and occupy its location in the manner here appearing, save by the consent of the state, under our statutory provisions above quoted. It is contended that this is an erroneous assumption, because the boom location is in navigable water exclusively under the control of the Federal government, it having assumed such control by act of Congress, and the company having acquired permission to maintain its boom, as located, from the secretary of war. We shall assume that the secretary of war has granted permission to the company, as asserted in the brief of its counsel,

though that does not affirmatively so appear in the record before us.

We have noticed that the Cowlitz river is wholly within our state and empties into the Columbia river, which is the boundary between our state and the state of Oregon, and which is a navigable highway from the mouth of the Cowlitz river to the Pacific ocean. So, the Cowlitz river, at the location of the company's boom, is navigable water of the United States, as well as of the state, in the sense that it is subject to the control of congress under the commerce clause of the Federal constitution looking to the preservation of navigability in the interest of interstate and foreign commerce. But this, to our minds, does not argue that the state does not own the bed and water of the Cowlitz river in the sense of having the right to control the waters of the river while flowing therein, subject only to the power of congress to prevent obstructions to navigation in the interest of interstate and foreign commerce.

At the beginning of our statehood, it was asserted in § 1, article 17, of our state constitution, that,

"The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes."

This was but an assertion of a right which the new state had by virtue of its sovereignty alone. In the early case of *Eisenbach v. Hatfield*, 2 Wash. 236, 26 Pac. 539, 12 L. R. A. 632, Chief Justice Anders, speaking for the court, said:

"In this state the common law is our rule of decision in the settlement of questions requiring judicial determination, when not specially provided for by

statute. And it seems to be generally conceded that at common law the title to the soil under tide water was vested in the crown. The ownership of the soil was regarded as a *jus privatum,* and could be conveyed to individuals, subject only to the public right of navigation and fishing, which public right was under the absolute control of parliament. In this country we have the highest authority in support of the doctrine that the state has succeeded to all the rights of both king and parliament, and hence is the absolute owner of all navigable waters and the soil under them within its territorial limits.''

This view has since then been expressed, in substance, in varying applications in *Pierce v. Kennedy,* 2 Wash. 324, 26 Pac. 554, 28 Pac. 35; *Board of Harbor Line Commissioners v. State ex rel. Yesler,* 2 Wash. 530, 27 Pac. 550; *Allen v. Forrest,* 8 Wash. 700, 36 Pac. 971, 24 L. R. A. 606; *Newell v. Loeb,* 77 Wash. 182, 137 Pac. 811; and *Hill v. Newell,* 86 Wash. 227, 149 Pac. 951. The question of ownership and control of navigable waters within the state of New Jersey was learnedly reviewed by the supreme court of judicature of that state, as early as 1821, in *Arnold v. Mundy,* 6 N. J. 1, where it was held, in substance, that the state, by virtue of its sovereignty alone, was the owner of, and had the right of control over, the beds and waters of its navigable waters within the state. That decision has become a leading one upon the subject, and has been cited, with approval, by many courts of this country, including the supreme court of the United States. True, that decision did not touch the question of state ownership and control being subject to congressional Federal control of such navigable waters. Indeed, up until that time, there seems to have been no assertion of Federal control over navigable waters within a state.

It has, we think, become well settled that the only

authority residing in the Federal government to exercise control over navigable waters is found in the Federal constitutionally delegated power to congress "to regulate commerce with foreign nations and among the several states and with the Indian tribes." Section 8, art. 1, Federal constitution. Had we no decisions of the courts enlightening us as to the meaning and scope of this clause of the Federal constitution, to our minds it would plainly mean, as applicable to our present problem, nothing more than that a state could not lawfully authorize the construction or placing, in navigable interstate and foreign commerce waters within its borders, of anything in the nature of an obstruction to navigation contrary to Federal regulations lawfully exercised in that behalf. This is far from meaning that the ownership and control of the beds and waters of the state's navigable waters are entirely surrounded by this constitutionally delegated commerce regulation clause of the Federal constitution.

In 1899, congress passed a rivers and harbors act reading in part as follows:

"The creation of any obstruction not affirmatively authorized by congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the chief of engineers and authorized by the secretary of war; . . ." U. S. Code, Title 33, § 403.

This language is, in substance, substantially of the same general import as other Federal legislation enacted prior to 1899, with reference to bridges and other specified structures in navigable waters. This con-

gressional act of 1899 is invoked by counsel for the company as constituting an entire abrogation of the state's ownership and control over its navigable waters. Decisions of the supreme court of the United States touching this and prior acts of congress of the same general import render it plain, we think, that this contention is not sound. In 1903, the supreme court of the United States had under consideration the question of concurrent power of the state of Illinois and the Federal government over navigable waters wholly within the state, and the necessity of state consent as well as Federal consent to maintain structures in such navigable waters, the subject being reviewed by that court in *Cummings v. Chicago,* 188 U. S. 410, in the light of the act of 1899 and prior acts. Holding that such consent from the state, its laws so requiring, was as necessary as such consent of the Federal government, Justice Harlan, speaking for the court, said in part:

"The general proposition upon which the plaintiffs base their right to relief is that the United States, by the acts of Congress referred to and by what has been done under those acts, has taken 'possession' of Calumet river, and so far as the erection in that river of structures such as bridges, docks, piers and the like is concerned, no jurisdiction or authority whatever remains with the local authorities. In a sense, but only in a limited sense, the United States has taken possession of Calumet river, by improving it, by causing it to be surveyed, and by establishing lines beyond which no dock or other structure shall be erected in the river without the approval or consent of the secretary of war, to whom has been committed the determination of such questions. But congress has not passed any act under which parties, having simply the consent of the secretary, may erect structures in Calumet river without reference to the wishes of the state of Illinois on the subject. We say the state of Illinois, because it must be assumed, under the allegations of the bill,

that the ordinances of the city of Chicago making the approval of its department of public works a condition precedent to the right of any one to erect structures in navigable waters within its limits, are consistent with the constitution and laws of that state and were passed under authority conferred on the city by the state.

"Calumet river, it must be remembered, is entirely within the limits of Illinois, and the authority of the state over it is plenary, subject only to such action as congress may take in execution of its power under the constitution to regulate commerce among the several states.

"It is only necessary to say that the act of 1899 does not manifest the purpose of congress to go to that extent under the power to regulate foreign and interstate commerce and thereby to supersede the original authority of the states. The effect of that act, reasonably interpreted, is to make the erection of a structure in a navigable river, within the limits of a state, depend upon the concurrent or joint assent of both the national government and the state government. The secretary of war, acting under the authority conferred by congress, may assent to the erection by private parties of such a structure. Without such assent the structure cannot be erected by them. But under existing legislation they must, before proceeding under such an authority, obtain also the assent of the state acting by its constituted agencies."

Prior decisions of the court were noticed by the learned justice. The later decisions of that court are in full harmony with the law so announced. *Montgomery v. Portland,* 190 U. S. 89; *North Shore Boom & Driving Co. v. Nicomen Boom Co.,* 212 U. S. 406; *Port of Seattle v. Oregon & W. R. R. Co.,* 255 U. S. 56; *United States v. Holt State Bank,* 270 U. S. 49. We conclude that our state statutory provisions, above quoted, prescribing conditions under which boom companies may occupy portions of the state's navigable waters, as here drawn in question, are not in the least

impaired in their effect by the provisions of the act of congress of 1899, above quoted, here invoked by counsel for the company.

Turning now to Robinson's second cause of action, we agree with the conclusions reached by the trial court, evidenced by its order and judgment of dismissal, that there was no substantial evidence sustaining recovery thereon by Robinson as against the company. While we are inclined to the view that the evidence does not warrant the conclusion that there was an accord and satisfaction, binding within itself, in the company's accounting to Robinson for the logs sold, we think there was no substantial evidence of the company's failure to fairly account to him for the logs sold by it upon his account.

The judgment of the superior court is reversed in so far as Robinson's first cause of action was withdrawn from the jury and dismissed, he is awarded a new trial thereon, and the case as to that cause of action is remanded to the superior court with directions to proceed accordingly. The judgment of the superior court is affirmed in so far as it withdrew from the consideration of the jury his second cause of action and dismissed the case as to that cause of action.

MILLARD, FULLERTON, MAIN, and FRENCH, JJ., concur.