[No. 15726. Department Two. July 12, 1920.]

## S. P. GEORGE, *Appellant*, v. PIERCE COUNTY *et al.*, *Respondents.*[1] ·

APPEAL (416)—REVIEW—FINDINGS.  Findings upon conflicting evidence in an equity case will not be disturbed on appeal unless it can be said that the evidence preponderates against them.

NAVIGABLE WATERS (21) — LANDS UNDER WATERS — ABANDONED CHANNEL—TITLE TO BEDS—AVULSION—BEFORE ADMISSION OF STATE. Where a navigable river changed its course by avulsion over public lands, before the admission of the state into the Union, the bed of the new channel remained in the government and was held in trust for the future state; and the trust title in the old channel thereupon ceased and the new state upon entering into the Union acquired no title thereto.

SAME (21)—ABANDONED CHANNEL—POSSESSORY RIGHTS.  The possessory rights of persons upon an old river channel, abandoned before the admission of the state, the title to which was in the government, cannot be questioned by the state which never had any title to the land, and the state can pass none by virtue of river improvements enhancing its value.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered June 18, 1919, upon findings in favor of the defendants, dismissing an action for an injunction, tried to the court.  Reversed.

*J. H. Easterday, M. J. Gordon,* and *J. F. Fitch* (*Carroll A. Gordon* on the brief), for appellant.

*William D. Askren, J. A. Sorley, Frank D. Nash, Fred C. Brown,* and *Howard Hanson,* for respondents.

[1]Reported in 191 Pac. 406.

TOLMAN, J.—In the year 1883, or prior thereto, the Puyallup river, at or near the city of Puyallup, by avulsion, made a new channel across the neck of a horseshoe or ox-bow bend in the stream as it had theretofore flowed, and thereafter, perhaps for four or five years, flowed through both the old and the new channel, but with the passing of time the old channel was closed up and the river was confined to the new channel, and long prior to the admission of this state in 1889, the old channel had become more or less filled with silt and alluvial deposits, had grown up to brush and timber, and in part was being farmed and otherwise occupied and put to use. In the year 1889, prior to the admission of the state, the land included in the old channel of the river was platted into lots and blocks, and streets and alleys laid out across the same. Since that time it has been further improved, is now occupied by residences and small farms, and the addition of which it forms a part has been carried on the assessment rolls of Pierce county for thirty years, and general taxes have been levied and paid thereon. Appellant, who was plaintiff below, came into possession of his lands, lying in such abandoned river bed, in 1915, under color of title deraigned by mesne conveyances from the patentee of the surrounding lands above the meander line. His lots are improved with a dwelling house, small factory, fruit trees, shrubbery, etc., and its level is about the same as the neighboring lands outside of the former river bed.

Respondents, King and Pierce counties, acting under authority of chapter 54 of the Laws of 1913 (Rem. Code, § 8145-1 et seq.), jointly adopted a plan and proceeded to act thereunder for the purpose of widening and straightening the channel of the Puyallup, Stuck and White rivers, so as to permanently confine the waters of such rivers to their respective channels and

prevent inundation of adjoining lands, and have proceeded to deepen and widen the Puyallup river at points contiguous and adjacent to the land occupied and claimed by appellant, and claim to have so deepened and improved the channel of the Puyallup river as to have prevented it from resuming at some future time the abandoned channel heretofore spoken of, and claim that title to such abandoned channel vested in the state of Washington upon its admission, and was conveyed jointly to King and Pierce counties by virtue of chapter 140 of the Laws of 1915 (Rem. Code, § 8145-12), and the work which the counties have done thereon. In carrying· out this theory that they had title to the abandoned channel of the stream, respondents proceeded to appraise the various parcels of lands lying therein, and gave notice that the same would be sold at public auction on a day certain. Thereupon the appellant brought this action upon behalf of himself and others similarly situated, for the purpose of enjoining such threatened sale. A temporary restraining order was entered, but, upon the trial of the cause, the same was vacated and the action dismissed at appellant's costs, and a decree entered quieting title to the premises in question in respondents. From such judgment and decree, appellant has brought the case here for review on appeal.

The trial court found that the Puyallup river is a navigable stream. The evidence upon this point is very conflicting and far from satisfactory, but we cannot say that it preponderates against the findings of the trial court, and must therefore accept that finding as made.

The Puyallup river, being navigable, the general rule is not in doubt. It is thus stated by the supreme court of the United States:

"The conclusions from the considerations and authorities above stated may be summed up as follows:

"Lands under tide waters are incapable of cultivation or improvement in the manner of lands above high water mark. They are of great value to the public for purposes of commerce, navigation and fishery. Their improvement by individuals, when permitted, is incidental or subordinate to the public use and right. Therefore the title and control of them are vested in the sovereign for the benefit of the whole people.

"At common law, the title and the dominion in lands flowed by the tide were in the King for the benefit of the nation. Upon the settlement of the Colonies, like rights passed to the grantees in the royal charters, in trust for the communities to be established. Upon the American Revolution, these rights, charged with a like trust, were vested in the original States within their respective borders, subject to the rights surrendered by the Constitution to the United States.

"Upon the acquisition of a Territory by the United States, whether by cession from one of the States, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people, and in trust for the several States to be ultimately created out of the Territory.

"The new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters, and in the lands under them, within their respective jurisdictions. The title and rights of riparian or littoral proprietors in the soil below high water mark, therefore are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution.

"The United States, while they hold the country as a Territory, having all the powers both of national and municipal government, may grant, for appropriate purposes, titles or rights in the soil below high water mark of tide waters. But they have never done so by general laws; and, unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interests of the people and

with the object for which the Territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the States, respectively, when organized and admitted into the Union.

"Grants by Congress of portions of the public lands within a Territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high water mark, and do not impair the title and dominion of the future state when created; but leave the question of the use of the shores by the owners of the uplands to the sovereign control of each state, subject only to the rights vested by the Constitution in the United States." *Shively v. Bowlby,* 152 U. S. 1.

This doctrine we have recognized and followed. *Newell v. Loeb,* 77 Wash. 182, 137 Pac. 811; *Hill v. Newell,* 86 Wash. 227, 149 Pac. 951.

This state, acting upon the rule as thus stated, by its Constitution, at once asserted its title to the beds and shores of navigable waters, except as to rights which had become vested, as follows:

"Section 1. Declaration of State Ownership. The State of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: Provided, that this section shall not be construed so as to debar any person from asserting his claim to vested rights in courts of this state.

"Sec. 2. Disclaimer of Certain Lands. The State of Washington disclaims all title in and claim to all tide, swamp, and overflowed lands patented by the United States: Provided, the same is not impeached for fraud." Constitution, article XVII.

This declaration by the state must be borne in mind throughout the discussion which follows, for "when

land under navigable water passes to the riparian pro-
prietor, along with the grant of the shore land by the
United States, it does not pass by force of the grant
alone, because the United States does not own it, but
passes by force of the declaration of the state, which
does own it, that it is attached to the shore." *Hardin
v. Shedd,* 190 U. S. 508.

It has frequently been held, where avulsion or sud-
den change in the channel of a stream has taken place
after the admission of the state or states abutting upon
the water course, that such avulsion or sudden change
does not change the boundary between the states or
divest the title which had theretofore vested in the
channel thus abandoned. *Nebraska v. Iowa,* 143 U. S.
186; *Gill v. Lydick,* 40 Neb. 508, 59 N. W. 104; Angell
on Watercourses, § 57; *Rees v. McDaniel,* 115 Mo. 145,
21 S. W. 913; *Cooley v. Golden,* 117 Mo. 33, 23 S. W.
100.

But it is strenuously contended here that these cases
do not apply because, at the time the Puyallup river
abandoned its old channel, which the trial court found
was in 1883, or prior thereto, the state had not come
into existence and had no title to such abandoned
channel, and that, when the state was admitted in 1889,
the river was flowing in its present channel, had per-
manently and completely abandoned the old channel,
and there passed from the national government to the
state title only to its bed and shores as it then flowed.

So far as appears, the new channel when formed was
cut from the public lands, and there is therefore no
question but that title to such new channel was in the
Federal government, and no reason is suggested or
perceived why the change of the channel, being perma-
nent, the government's title to such new channel
should not thereupon become impressed with the trust

for the future state to the same extent and effect as though the change had occurred in prehistoric ages, and if so, the trust character of the government's title to the old channel must necessarily have ceased when the trust title in the new channel arose. There could be no reason, in fact or in law, for both titles to persist for the benefit of the future state. The evidences, on every hand in this state of changes in and cessations of water courses and bodies of water which must have been navigable at some time in the past, are such as to call for such a rule as a matter of reason; otherwise, as the statute of limitations does not run against the state, the title to only the mountain peaks would be unassailable. Although there are numerous authorities which hold that, if the change of channels had occurred after the state's title had become vested, then the state's title to the .old channel would not have been thereby divested, and we have so held in *Newell v. Loeb* and *Hill v. Newell, supra,* yet no authorities bearing on the particular point we are now considering are presented ·by either side, and our search has revealed none. We therefore rest our opinion purely upon what seems to us to be the logic of the situation.

If, then, we are right in our conclusion that the trust title for the future state in the old channel ceased when the trust title in the new channel arose, what became of the title to the old channel? As the title of the government had been freed from the trust for the future state long prior to its admission, the full and unrestricted title must, therefore, have vested in the government as a part of the public domain, which it could retain or grant or permit to pass to the owner by patent of the abutting uplands under the rule as to accretions, without any further consent from the state

than that contained in the constitutional provision which has been set forth.

Respondents contend that the title of the patentees of the lands abutting upon the old channel did not extend below high water mark, and that, as no grant has since been made by the government, they and their successors can have no title to the land now embraced in such old channel. It would seem that, if the state never had the title to the old channel, and appellant is in possession, as admitted, his possessory rights are sufficient as against respondent's and can be questioned, if at all, only by the government. One of the witnesses, who was brought up on the banks of the Puyallup river at the point in question, testified as follows:

"A. I would say as near as I can guess, it would be about 1876 when it broke through, or possibly— Q. Since it first broke through has it continued to run in the same channel? A. There were several years, as I recall, until the volume of the water had cut through the new channel. It might have been five years. It kept washing all the time and still running in both channels for a number of years until it filled up the old channel."

On cross-examination:

"Q. You say the water continued to run in both channels? A. It did for a number of years, until the new channel got wiped out. Q. For about how many years? A. I would say, just guessing, four or five. Q. Then it continued to run in both channels until along in 1893 or 1894? A. Oh, no; not that long. Q. About what time? A. It came through possible, that is guess work, about 1876, and it possible might be up until 1880, although at extreme high water it would be backed up in there some. Q. How old are you? A. 52. Q. Would you have any recollection of whether or not it cut through in 1876? A. As near as I can get to it. I recollect the river when it had not broke through and

I recollect being on the bank of the river and following along at the bank and then it broke through. I was simply estimating the time by how old I was at that time.''

While this testimony is somewhat vague, as it necessarily must be considering the lapse of time, we find nothing in the record which directly or indirectly contradicts it, or tends in any way to lessen its force.

The evidence just quoted tends to support the theory of title by accretion, and if the Puyallup river were a nonnavigable stream, would undoubtedly support such a title. *Denee v. Morrison*, 95 Wash. 76, 163 Pac. 382, and cases there cited. We apprehend, however, that, as the government is not a party here, it is beyond our power now to settle that question, and that it is wholly unnecessary to attempt to settle it in this case.

Respondents further contend that the work which they have performed tends to confine the river to its new channel and lessen the danger of its resuming its flow through the old channel, and while this may be true in a sense, yet, from a careful reading of the whole record, we are not satisfied that the river, before the performance of respondents' work, was any more likely to break out at this point than at any other, and the history of the river for some forty years, as given by the witnesses, convinces us that no such resumption of the old channel was a probability; but in any event, if the state had no title, it could pass none to respondents, however necessary and advantageous their work might have been.

In view of the conclusions reached, we find no necessity for a discussion of the other points raised by appellant.

For the reasons given, the judgment is reversed, with directions to enter judgment permanently enjoin-

ing respondents from interfering with appellant's possession of the property described in his complaint.

HOLCOMB, C. J., MOUNT, FULLERTON, and BRIDGES, JJ., concur.