[No. 29976. Department Two. December 12, 1946.]

NOEL M. GHIONE, *Appellant,* v. THE STATE OF WASHINGTON, *Respondent,* COMMERCIAL WATERWAY DISTRICT NO. 2 OF KING COUNTY, *Appellant.*[1]

[1]Reported in 175 P. (2d) 955.

*Monheimer, Schermer & Mifflin,* for appellant Ghione.

*Wm. V. Cowan,* for intervener-appellant Commercial Waterway District No. 2 of King County.

*The Attorney General* and *R. A. Moen, Assistant,* for respondent.

*Skeel, McKelvy, Henke, Evenson & Uhlmann, amicus curiae.*

STEINERT, J.—This was an action to determine the boundaries of certain land, to quiet title to the area involved, as determined by the true boundaries thereof, and to recover compensation for the portion of the land appropriated by the defendant and damages resulting from certain excavations made by the defendant upon other portions of the land.

Plaintiff alleged in his complaint that he was the contract purchaser of certain land located in the H. H. Tobin Donation Land Claim, in King county, Washington; that the western boundary of the land was uncertain; and that the state of Washington was asserting title to a portion of his land and, through its department of highways, had entered thereon, without plaintiff's consent, for the construction of a road and had also excavated and removed from the land large quantities of earth and gravel. He prayed that the court determine and fix the disputed boundaries, quiet title to his property as against the state, award him damages equal to (1) the value of the fill removed, (2) the amount by which the reasonable value of his property had been reduced by reason of such excavation, and (3) the value of the land taken by the state for its highway, if it should be found that the road encroached upon his tract, and allow him his costs and disbursements.

The state, through its attorney general, answered, alleging that it was the owner of the land from which the gravel had been taken, by reason of the fact that such land was a part of the bed of a navigable stream, Black river, at the time the state of Washington was admitted into the Union, and such river bed had become a part of the public lands by virtue of the state constitution as then adopted. It further alleged that the banks of Black river had become obscured by reason of its drying up in the year 1915, and the subsequent development in that vicinity. In further assertion of its exclusive ownership of the land as against certain owners of property bordering upon the banks of the former bed of Black river in the particular vicinity, the state brought into the action, as additional parties defendant, Defense Plant Corporation, King County, Tom Harries and wife, and Eber Badcon and wife. In its prayer, the state asked that the court fix the lines of ordinary high water of Black river between certain points, as those lines stood in 1889 when the state of Washington was admitted into the Union, and that the state be adjudged the owner in fee simple of all lands lying between those lines.

Commercial Waterway District No. 2 of King county duly intervened in the action, asserting in its complaint in intervention that it had become vested, by statute, with the state's title to the bed of Black river and also a portion of the bed of its tributary, Cedar river, and praying the court to quiet title in favor of the waterway district as against both the plaintiff and all the parties defendant.

King county appeared and was represented at the trial, but took no active part therein; Defense Plant Corporation and the Harrieses filed pleadings, but did not otherwise appear and were not represented at the trial; Eber Badcon and his wife were defaulted for failure to appear or answer.

At the conclusion of the trial before the court, without a jury, the court rendered a memorandum opinion, and thereafter made findings of fact, drew conclusions of law, and entered judgment to the following effect: that the state was entitled to the bed of Black river as it existed when Washington was admitted to statehood, also to the bed of

Black river as it was situate when it was abandoned as a watercourse in 1915, and to the land, if any, intervening between the two locations as of those respective dates; that the plaintiff, Noel M. Ghione, was entitled to quiet enjoyment of his tract outside the state's boundaries, and to the sum of $83.44, which was stipulated to be the value of a small amount of fill taken from beyond the state's land; and that the intervener, Commercial Waterway District No. 2 of King County, had no interest whatever in the bed of Black river. Costs were not allowed to any party.

Both the plaintiff and the intervener have appealed from the judgment of the trial court. Plaintiff will hereinafter be referred to as appellant, and the commercial waterway district as intervener.

Before entering upon a discussion of the questions presented by the appeal, we deem it necessary to give a brief description of the land here involved and its pertinent history.

In its primitive state, Lake Washington, a large fresh water lake forming the eastern border of what is now the city of Seattle, had its outlet in Black river, at the southern extremity of the lake. This river, normally a wide, shallow, sluggish stream, ran southwardly and then westwardly into the Duwamish river, which in turn flowed into Puget Sound at the southern end of Elliott Bay, Seattle's harbor. From the region east of Lake Washington, through the foothills of the Cascade mountains, came Cedar river, a swift stream carrying large quantities of gravel along its course and emptying into Black river a short distance south of the lake. Both of these rivers flooded at times, overflowing their low banks, and, within the memory of witnesses, Cedar river has taken a temporary course through the city of Renton itself. When other connected rivers ran high, Black river even reversed its course, flowing into, rather than out of, Lake Washington. We may also add that, for the purposes of this case, it is conceded that the two rivers originally were navigable streams.

In the year 1865, a public survey was made of township 23 north, range 5 east, Willamette Meridian, which includes

the land here in controversy, and a map was prepared therefrom by the surveyor general for Washington Territory. Copies of the map and the survey notes were introduced in evidence in this case. The contours of Black and Cedar rivers as shown by this survey are hereinafter designated and referred to as the "meander lines."

Apparently, only one other reliable survey of these watercourses was made prior to the time when the two rivers were altered by projects for internal improvements. This was a war department survey, undertaken by the United States district engineer, entitled Duwamish-Puyallup Surveys 1907. Sheet 7 of that survey, introduced in evidence by the state, shows the land here under consideration and likewise shows the meander lines drawn in the 1865 survey. The diagram which follows is a copy of the material portion of this map, upon which, for clearer understanding, we have noted certain descriptive words and designations.

The hatched lines represent the 1865 meander lines of the two rivers. The dotted areas represent shallow bars or dry sloughs. The crosses indicate approximately the northeastern and southeastern corners of the tract being purchased by the appellant, Noel M. Ghione.

In 1873, the Federal government issued letters patent to the widow and heirs of Henry H. Tobin, conveying to them a portion of township 23, described by metes and bounds, and known as the H. H. Tobin Donation Land Claim. The northern and western boundaries, so far as are material here, were coincident with the 1865 survey description of part of the meander line of Cedar river to the point of its confluence with Black river, and of the meander line of Black river south from that point for some distance.

At some time not clearly disclosed by the evidence, but close to 1913, Commercial Waterway District No. 2 of King County, intervener and one of the appellants herein, diverted Cedar river from its course, above stream and east of the land here in controversy, so that Cedar river then flowed, and has since continued to flow, directly into Lake Washington. Consequently, a part of the former channel of Cedar river was abandoned, and thereafter that river contributed only indirectly to the waters of Black river, which, according to the testimony of old-time residents of Renton, was then reduced to a much smaller stream.

In the year 1915, the waters of Lake Washington were lowered by the completion of a canal connecting the lake with Puget Sound. The history of this improvement may be found in the case of *Bilger v. State,* 63 Wash. 457, 116 Pac. 19. As a consequence of the lowering of the lake, Black river ceased to flow at all. Thus only the dry bed of Black river and the dry bed of the abandoned portion of Cedar river remained to mark the boundaries of the H. H. Tobin Donation Land Claim on the north and west; and even these beds have been largely obliterated by the passage of time and the improvements made in that vicinity.

In February, 1940, appellant, Noel M. Ghione, entered into a contract with King county for the purchase of tax title land described as

" . . . that portion of The Donation Land Claim of Diana B. Smithers, formerly Diana B. Tobin, a widow, and the Heirs at Law of Henry H. Tobin, deceased, designated as Claim No. 37, being parts of Sections 17, 18 and 20 in Township 23 North, Range 5 E.W.M., described as follows:

"Beginning at a point 905.8 feet West and 335 feet North of the Southeast corner of D. C. Mitchell's two acre tracts; thence North to the South bank of the Cedar River; thence Westerly to Black River; thence Southerly, along the East bank of Black River to a point West of the point of beginning; thence East to the true point of beginning, LESS portion for street purposes."

On July 9, 1940, and again on March 14, 1941, the state commissioner of public lands issued to the state department of highways permits for the removal of road material from state shorelands in King county. The pit sites, which were described with accuracy in the permits, were located practically within the meander lines of Black river, as those lines were drawn in 1865, at points within the tract of land as described in appellant's contract of purchase.

Between October, 1940, and November, 1941, the highway department took gravel and dirt from these pits to use in its construction of state primary highway No. 5, the new Seattle-Renton road, which was being constructed just to the west of the gravel pits and, according to one witness, almost directly over, or toward the east side of, the site of Black river as it ran before Lake Washington was lowered.

In this connection, we may add that the tract of land south and east of the junction of the Cedar and Black river beds has apparently never been used except for the excavation of gravel deposits some years ago. Virtually all of the land here in controversy lies within the corporate limits of the city of Renton. Dixie avenue presently intersects this tract, and that portion of the tract lying north of Dixie avenue has been appropriated by the Defense Plant Corporation. The southern portion, from which the fill was

taken, is situated approximately at the northwest corner of the city of Renton and is bounded roughly by state primary highway No. 5 on the west, Tobin street on the south, Lake street on the east, and Dixie avenue on the north.

The state department of lands had, at some time not disclosed by the record, classified the area within the meander lines of Black river as unplatted first-class shorelands, on the basis of the public survey of 1865. However, records of the department show that the state never made any disposition of the land in controversy, prior to issuing the permits of 1940 and 1941; and there is no indication that appellant or his predecessors in title had any knowledge of the state's claim prior to the acts of which complaint is now made.

Appellant, after contracting to purchase the tract above described, planned to move a small apartment house onto the land. On discovering the highway department's intrusion upon what he considered to be his land, he made objection to the state engineer having charge of the project. He later set his apartment house on the unimpaired portion of the tract, at the corner of Tobin and Lake streets, east of the meander line of Black river. It appears from his evidence that the best use to which the land can be put is for building sites, and that the market value of the block of land bounded by the highway and the three streets above mentioned was reduced by about $440 because of the excavations therefrom.

The issues presented by the separate appeals of the appellant, Ghione, and of Commercial Waterway District No. 2, intervener, are distinct from each other, and we shall therefore consider and dispose of them separately.

Appellant Ghione has assigned as errors portions of the findings of fact, conclusions of law, and judgment entered by the trial court. However, in view of the decision we have reached herein, it will not be necessary to consider some of his assignments. The principal issues for our determination on this branch of the case are (1) whether land which was covered by navigable water when Washington was admitted to statehood remains public land when the

water moves imperceptibly into a different course; (2) if not, whether there was sufficient evidence in this case to establish the last high-water lines of the two rivers; and (3) what, under the facts of this case, is the proper measure of damages.

In taking this view of the issues here presented, we proceed upon the accepted fact that the bed of Black river shifted westward between 1865, the date of the original survey, and 1915, when the river bed was abandoned; furthermore, the evidence indicates that such shifting was a slow and continuous process. The trial court so found, and there is no dispute as to those facts. The essence of the dispute between the appellant and the state is: Who owns the land uncovered by this shift of the stream?

The attorney general contends that the state has title to lands which lay within the lines of ordinary high water of navigable streams in 1889, even though, by imperceptible accretions or relictions, such lands have since come above the line of ordinary high water and have ceased to be a part of the river bed. To express the contention another way, the state claims title to the 1889 bed (assumed to be coincident with the bed of the stream as it was situate in 1865, when the original survey was made) and also claims title to the bed of the river as it existed in 1915.

Before examining the grounds for the state's claim, we shall advert to the general rule which controls in such a case as this. As stated in 2 Aigler, Bigelow and Powell, Cases on Property (1942), at p. 665, there is little dispute that, when a boundary line is the center, the low-water mark, the high-water mark, or any other water line of any watercourse, any shifting of that line by gradual and imperceptible change, whether it be by the gradual recession of the water (reliction), or by the gradual extension of the land by the deposit of alluvial soil (accretion), results in a corresponding shift in the boundary line. *Arkansas v. Tennessee,* 246 U. S. 158, 62 L. Ed. 638, 38 S. Ct. 301; *Allen v. Wood,* 256 Mass. 343, 152 N. E. 617; 1 Farnham, Waters and Water Rights, §§ 69, 72; Tiffany, Real Property (3rd ed.), §§ 1219, 1220; 11 C. J. S. 579, Boundaries, § 34.

A thorough review of the policy and precedent which gives rise to the rule will be found in *Jefferis v. East Omaha Land Co.,* 134 U. S. 178, 33 L. Ed. 872, 10 S. Ct. 518. It is said that this rule of accretion is everywhere admitted and applies to both tidewaters and fresh waters. 6 Thompson, Real Property (Perm. ed.) 663, § 3436. The cases above cited all deal with navigable waters; but the navigability of the water seems to be immaterial. 1 Farnham, Waters and Water Rights 329, § 72.

This court has held on several occasions that accretions to the bank belong to the owner of the upland adjoining the stream which constitutes one of his boundaries. *Spinning v. Pugh,* 65 Wash. 490, 118 Pac. 635 (Puyallup river); *Rue v. Oregon & Washington R. Co.,* 109 Wash. 436, 186 Pac. 1074 (Dickodochteder river); *Harper v. Holston,* 119 Wash. 436, 205 Pac. 1062 (Yakima river); *Glenn v. Wagner,* 199 Wash. 160, 90 P. (2d) 734 (Satsop river).

In the *Harper* case, *supra,* this court said:

"Another rule is that, when grants of land border on running water, and the course of the stream is changed by that process known as accretion—that is to say, the gradual washing away on the one side and the gradual building up on the other—the owner's boundary changes with the changing course of the stream. As was said by the supreme court of the United States in *New Orleans v. United States,* 10 Peters (35 U. S.) 662 [involving the Mississippi river]:

" 'No other rule can be applied, on just principles. Every proprietor whose land is thus bounded, is subject to loss, by the same means which may add to his territory; and as he is without remedy for his loss, in this way, he cannot be held accountable for his gains.'

"The rule is as much applicable to the government as it is to private individuals. If the government chooses to grant its lands, making a running stream one of the boundaries of the grant, it must expect this part of the boundary to change as time goes on. Ordinarily it gains in one place what it loses in another, and on no principle of justice can it say that it is not to be subjected to the general rule. And such we understand to be the holding of the supreme court in *Jefferis v. East Omaha Land Co.,* 134 U. S. 178. There the boundary was the Missouri river. The

patent to the land made to the individual by the government was made some years after the survey, during which time there had been an accretion to the land by the changing course of the stream. It was held that a patent to the land according to the lot number of the official plat of the survey conveyed to the patentee the title to all accretion which had been formed between the time of the survey and the date of the patent."

The difficulty of applying a contrary rule is illustrated in *Sartori v. Denny-Renton Clay & Coal Co.*, 77 Wash. 166, 137 Pac. 494, where the parties had fixed the thread of Cedar river, at a given time, as a static common boundary. This court, looking for the boundary five years later, remarked that "one might as well look for the proverbial needle in the haystack."

In the case at bar, the attorney general argues that the above-stated rule of universal application does not apply in this state to boundaries of lands adjoining navigable water. To avoid the force of the above-cited Washington cases, he seeks to distinguish them on the ground that the court was therein dealing with nonnavigable streams, or else with rivers not adjudged navigable.

The argument of the attorney general is based upon provisions of (1) Art. XVII, § 1, of the state constitution and (2) Rem. Rev. Stat., § 7981 [P.P.C. § 849-9].

Article XVII, § 1, reads as follows:

"The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: Provided, that this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state."

As we understand the argument of the attorney general, his contention in this case would require such an interpretation of the constitutional provision as would give the state a dual claim: (1) to all lands which, in 1889 when the state was admitted into the Union, were covered by navigable waters; and (2) to all lands which have since become sub-

merged in navigable waters. As can readily be seen and as demonstrated by the facts of this very case, the effect of such an interpretation would be to vest the state with title not only to all lands which are presently within the lines of ordinary high water, but also to all lands which may have, at any time since 1889, been so situated, regardless of their change in character. Such an interpretation would lead to serious consequences, as was recognized in *George v. Pierce County,* 111 Wash. 495, 191 Pac. 406. All water boundaries of uplands abutting upon navigable waters would be referable to the high-water line of 1889 or of any subsequent year in which the water made its utmost encroachment upon the upland. At the same time, owners of such land would be deprived of the benefit of any recession of waters below such line. Added to this, there would be present at all times a difficult, but inherent, problem of proving the artificial boundary thus achieved.

We do not agree with the construction sought for by the attorney general, not only because it is contrary to the universal and convenient rule set forth above, but also because it ignores the historical origin of Art. XVII, § 1, of the constitution.

■ When Washington was organized as a state, it became the owner of the navigable waters within its boundaries and of the land under such waters, subject to Federal control for purposes of navigation. It was free to choose a rule to govern the extent of its control of those beds and foreshores, to the line of ordinary high water. This was so because of common-law principle. *Eisenbach v. Hatfield,* 2 Wash. 236, 26 Pac. 539, 12 L. R. A. 632, the reasoning of which opinion was reconsidered and affirmed in *Board of Harbor Line Com'rs v. State ex rel. Yesler,* 2 Wash. 530, 27 Pac. 550. The state's freedom of choice in this respect was likewise established by Federal law. *Port of Seattle v. Oregon & Washington R. Co.,* 255 U. S. 56, 65 L. Ed. 500, 41 S. Ct. 237; *Brace & Hergert Mill Co. v. State,* 49 Wash. 326, 95 Pac. 278; *Robinson v. Silver Lake R. & Lbr. Co.,* 153 Wash. 261, 279 Pac. 1109.

■ The effect of Art. XVII was to incorporate in our constitution the rule that the state is free to dispose of the foreshores of navigable water, between navigable depth and the line of ordinary high water, as it sees fit. *Hill v. Newell,* 86 Wash. 227, 149 Pac. 951, is illustrative. See, also, 1 Farnham, Waters and Water Rights, 207 *et seq.;* 2 Minn. L. Rev. 429, 444, 445.

■ These authorities are sufficient to indicate that Art. XVII, § 1, conforms to general principles of American law relating to control by the state over the beds and shores of its navigable waters, and is not necessarily inconsistent with the established rule that water boundaries vary with the water line.

Perhaps for this reason, counsel for the state emphasizes not the text of the constitution, but rather the cases which have dealt with statutes passed pursuant to Art. XVII. On this point, the state contends that the right of the upland owner to soil added to the upland by accretion or reliction is an incident of riparian ownership, and that in this state the owner of upland abutting on navigable waters has no riparian rights. Its authority for this argument is well summed up in the following quotation from *Port of Seattle v. Oregon & Washington R. Co., supra:*

"*Second.* Under the law of Washington (which differs in this respect from the law generally prevailing elsewhere) a conveyance by the State of uplands abutting upon a natural navigable waterway grants no right of any kind either in land below highwater mark, *Eisenbach v. Hatfield,* 2 Washington, 236; or in, to, or over the water, *Van Siclen v. Muir,* 46 Washington, 38, 41; except the limited preferential right conferred by statute upon the owner of the upland, to purchase the shoreland, if the State concludes to sell the same. Act of March 26, 1890, §§ 11 and 12, Laws of Washington 1889-1890, p. 505. The grantee of the upland cannot complain of another who erects a structure below highwater mark, *Muir v. Johnson,* 49 Washington, 66. He does not acquire any right of access over the intervening land and water area to the navigable channel, *Lownsdale v. Grays Harbor Boom Co.,* 54 Washington, 542, 550, 551. So complete is the absence of riparian or littoral rights that the State may—subject to the superior rights of the United States—

wholly divert a navigable stream, sell the river bed and yet have impaired in so doing no right of the upland owners whose land is thereby separated from all contact with the water. *Newell v. Loeb,* 77 Washington, 182, 193—194; *Hill v. Newell,* 86 Washington, 227, 228."

A footnote to this statement explains that in some states the shore between high and low water belongs to the owner of the upland, and in other states he has the right to access to the navigable water over such shoreland, but that in Washington the state retains the *proprietary* right to the soil below high-water mark.

An examination of this accurate statement by Mr. Justice Brandeis shows that he was concerned with cases either denying the upland owner any *interest* in land below the line of ordinary high water, or denying the upland owner any special *right of access* to water of navigable depth; and these were properly characterized as riparian or littoral rights denied to the upland owner. However, none of these cases cited by him dealt with *changes in the water boundaries* by slow and natural processes. *Eisenbach v. Hatfield, supra,* concerned improvements to the tideland, and the upland owner's asserted inherent easement or servitude; it expressly reserved the question of accretions. *Van Siclen v. Muir, supra,* involved the right of the upland owner as against one who moored his houseboat over the shoreland. *Muir v. Johnson, supra,* related to injunctive relief based upon the upland owner's right to purchase, in the same situation. *Lownsdale v. Grays Harbor Boom Co., supra,* as is indicated by the foregoing quotation, denied that the upland owner had a right of access to water of navigable depth across tideland deeded by the state to another.

Whether an increase to the upland, by reason of accretion or reliction, vests in the owner of the upland by virtue of a riparian or littoral right, or whether the rule is simply a convenient means of retaining an identifiable boundary, is debatable. See 4 Tiffany, Real Property (3d ed.), § 1220; 2 Aigler, Bigelow & Powell, Cases on Property, 660, note 23; 11 C. J. S. 572 *et seq.,* Boundaries, § 30 *et seq.* Suffice it to say that the cases above cited deal only with rights as

between possessors of upland and tide or shore land; they do not establish precedent for determining the boundary between the two classes of land when the water shifts by imperceptible degree.

It is our conclusion that the foregoing authority cited by the attorney general is not inconsistent with the general rule that the water boundary shifts with the natural and gradual moving of the water line which fixes that boundary.

 The second basis of the attorney general's argument is predicated upon Laws of 1899, chapter 83, p. 132, § 1, appearing as Rem. Rev. Stat., § 7981, which, so far as material here, reads as follows:

"All tide and shore lands except as herein expressly provided shall be sold upon the terms provided for the sale of school and granted lands, . . . Provided, that any accretions that may be added to any tract or tracts of tide or shore lands heretofore sold or that may hereafter be sold by the state shall belong to the state, and shall not be sold or offered for sale until the said accretions shall have been first surveyed and platted under the direction of the commissioner of public lands, and the adjacent owner shall have the preference right to purchase said lands for thirty days after the same shall be offered for sale: Provided, further . . . [relating to appeals]."

The proviso of the 1899 act, relating to accretions, was re-enacted by the legislature in 1927 (Laws of 1927, Chapter 255, p. 531, now appearing as Rem. Rev. Stat., § 7797-123 [P.P.C. § 940-599]). It is pertinent to note that the amendment deleted the requirement of platting; clarified the phrase "adjacent owner" by substituting for it the words "owner of the adjacent tide or shore lands"; clarified the phrase "said lands" by substituting for it the words "said lands produced by accretion"; and added a requirement that "the owner of the adjacent tide or shore lands shall be notified by registered mail of his preference right to purchase such accreted lands."

It is clear to us that this act does not apply to the case at bar, as the attorney general contends. The statute in its original form is perhaps confusing, but the amendment clearly shows that it does not relate to accretions in the

ordinary sense of the term, that is, accretions to uplands, but, on the contrary, relates to accretions to *tide and shore lands,* and therefore accretions, by definition, situate below the line of ordinary high tide or ordinary high water which marks the boundary *between* tide or shore land and the adjoining upland. Moreover, the statute expressly applies only to such accretions formed *after* such tide and shore lands have been sold by the state. That such was the intention of the legislature is shown by the relation of the proviso (having reference to tide and shore lands), and by the amendments made in 1927. That such has been the understanding of this court is apparent from *Strand v. State,* 16 Wn. (2d) 107, 132 P. (2d) 1011, the only case, apparently, in which the statute has been applied.

We withhold any expression of opinion as to the effect of a change in water boundary between upland and tide or shore land *after* the tide or shore land has been surveyed and sold or otherwise conveyed by the state.

In view of the universal rule above stated and of our acceptance of that rule, we are of the opinion that the trial court erred in allowing its decision to be governed by the assumed location of the bed of Black river in 1889. Appellant's predecessors in interest being the owners of accretions to the eastern bank of the river, the state was entitled only to the bed and shores of Black river as they were situate when, by the diversion of Cedar river and the lowering of Lake Washington, Black river ceased to be a navigable stream.

Where those boundaries were, the trial court did not attempt to answer directly. The court did, however, find that:

"By reason of the channel change in the Cedar River and the abandonment and drying up of the Black River and the subsequent development of the surrounding territory, the lines of ordinary high water in said rivers have become obscured and difficult, if not impossible, of exact ascertainment."

Appellant contends that this finding is erroneous. The case being before us *de novo,* by virtue of Rem. Rev. Stat.,

§ 1736 [P.P.C. § 5-65], we have examined the evidence and are persuaded that the trial court did err in this finding, if it meant that there was no evidence from which the borders of the river in 1914 or 1915 could be approximated.

The state does not seriously contend that it took the fill from the 1915 river bed. Its exhibit No. 39, Plat of Right of Way, admitted as proof of the highway department's compliance with statutory procedure for use of state lands, shows plainly that it rested its rights on the 1865 meander lines; and its 1943 survey map, exhibit No. 24, confirms this.

█ We must, therefore, here consider briefly the force of the government survey meander lines. In surveying fractional portions of public lands bordering upon streams, meander lines are run, not as boundaries of tracts of land, but for the purpose of defining the sinuosities of the banks of the stream, and as a means of ascertaining the quantity of land in the fractions. In the absence of special circumstances not relevant here, the watercourse itself provides the natural boundary. *Railroad Co. v. Schurmeir*, 7 Wall. (74 U. S.) 272, 19 L. Ed. 74; 8 Am. Jur. 766, Boundaries, § 29; 11 C. J. S. 273, Boundaries, § 30b. This court has affirmed that rule. *Rue v. Oregon & Washington R. Co.*, 109 Wash. 436, 186 Pac. 1074; *Harper v. Holston*, 119 Wash. 436, 205 Pac. 1062.

█ While the meander lines shown by the 1865 survey, in this case, may be considered as evidence of the actual high-water lines of Black and Cedar rivers at that time, they are not conclusive as to the actual water line as it existed either then or later. Where boundaries are lost or are uncertain, they may be established by the best evidence available in the circumstances. 11 C. J. S. 703, Boundaries, § 108; 8 Am. Jur. 810, Boundaries, § 89.

█ In our judgment, good evidence was submitted by both the appellant and the state that the actual watercourses of Black and Cedar rivers at the time they dried up were not coincident with the meander lines of 1865. Of especial value in this respect is the war department survey of these two streams, as shown by the state's exhibit No. 43, Duwamish-Puyallup Survey (1907), sheet 7, used as a basis for the

appended sketch. Concerning this exhibit, Mr. Reed, chief engineer of the department of public lands, testified that it was the only map, other than that of the original survey, which he considered of any value. He stated that, whereas the other maps were what is known as assembled maps, that is, maps made from assembled data, this map was made for the purpose of showing the river particularly.

Tending to support this evidence of the last high-water lines of the two rivers is exhibit No. 3, the aerial photograph of 1940, interpreted by a civil engineer employed by the United States army engineers; exhibit No. 6, the 1911 map of Commercial Waterway District No. 2; exhibit No. 9, the King county engineer's map of the city of Renton; and exhibit No. 47, the Commercial Waterway District's reference map of Renton (1911). The testimony of men who were familiar with the two rivers before they disappeared from the watercourses in controversy likewise tends to support the view that the rivers ran, at this point, just about as they are depicted in the survey of 1907.

Counsel for the state endeavors to meet this evidence simply by a statement that such evidence relates only to the courses of the rivers eighteen years or more after Washington was admitted into the Union. But, as we have already shown, the correct question of fact is with regard to the location of these rivers when they ceased to be navigable, which was only about six years after the war department's survey.

We are of the view that the trial court should have made use of this evidence to establish, as nearly as possible, a boundary line corresponding to the physical site of the two rivers at the time their beds were abandoned.

Our conclusion upon this branch of the case makes it necessary for us now to consider one other assignment of error specified by the appellant. He contends that, in fixing the amount of the damages, the trial court should have included both the amount of damage to the land caused by the excavation and the value of the fill material taken by the state. On the other hand, the state contends that our

opinion in *Armstrong v. Seattle,* 180 Wash. 39, 38 P. (2d) 377, 97 A. L. R. 826, is conclusive as against the latter claim.

In that case, the owner of certain land brought suit against the city of Seattle for damages caused by the removal of gravel from her property. She sought to recover both for the value of the gravel taken and for the damage to her lots resulting from the excavation. The trial court allowed damages on the basis of the value of the gravel taken. In reversing the judgment, this court said:

"The court allowed compensation on the basis of value of the gravel taken. Where an entire property is taken, the measure of compensation is its fair market value. But where there is a 'damaging' of property, under the constitutional provision (Art. I, § 16), the measure of compensation is the difference between the fair market value of the property before and after it was damaged. *Kincaid v. Seattle,* 74 Wash. 617, 134 Pac. 504, 135 Pac. 820. The injury here was a damaging, in contemplation of the constitutional provision. The measure of recovery, therefore, is the difference between the market value of the property before and after it was damaged."

In the *Kincaid* case, cited, we said:

"If the slope is a damage, it can be measured under the general rule, *i. e.,* the fair market value of the property before and after the taking. This measure is comprehensive, and except in rare instances, will cover all items of damage. It is approved by all textwriters and has the sanction of this court. [Citing cases.]."

Appellant urges that this is a harsh rule and should not be followed in the case at bar. He does not cite authority for any contrary principle, and we assume that he would have us declare this case to be one of the "rare instances" referred to in the *Kincaid* case, *supra.*

■ As stated in 3 Sedgwick on Damages (9th ed.) 1916, § 932,

"The general principle upon which compensation for injuries to real property is given, is that the plaintiff should be reimbursed to the extent of the injury to the property. The injury caused by the defendant may be of a permanent nature; in such a case the measure of damages is the diminution in the market value of the property."

Accord: *Messenger v. Frye,* 176 Wash. 291, 28 P. (2d) 1023; *Herbert A. Nieman & Co. v. Holton & Hunkel Greenhouse Co.,* 248 Wis. 324, 21 N. W. (2d) 637; Note, Measure of Damages for Wrongful Removal of Earth, Sand, or Gravel from Land, 97 A. L. R. 830; 15 Am. Jur. 529, Damages, § 120; 25 C. J. S. 603, 616, Damages, §§ 84, 85e.

It is true that a few courts in other jurisdictions have permitted recovery both for the value of the fill taken and for injury to the land. See *Gallagher v. R. E. Cunniff, Inc.,* 314 Mass. 7, 49 N. E. (2d) 448, where recovery was allowed upon causes of action for trespass and for trover and conversion. However, it is our view that such double recovery is contrary to the principle of compensatory damages approved in the *Kincaid* case, *supra.*

We hold that the trial court properly restricted recovery to damages caused to the appellant's property, and should apply this measure of compensation in calculating injury to land proved to be within appellant's boundaries, when established in accordance with the views hereinbefore expressed.

 The appellant also objects to the trial court's conclusion that none of the parties to this action was entitled to any costs against the others. It is sufficient to say that the trial court had no authority to assess appellant's costs against the state. *Washington Recorder Pub. Co. v. Ernst,* 1 Wn. (2d) 545, 97 P. (2d) 116.

We now turn to the case presented by Commercial Waterway District No. 2 of King county, intervener, and the other active party appellant herein.

The waterway district contends that it, and not the state, is entitled to the bed of Black river, when the boundaries of that bed are determined, by reason of the provisions of Chapter 11, p. 21, § 8, Laws of 1911, now appearing as Rem. Rev. Stat., § 9732 [P.P.C. § 431-35], the pertinent part of which reads as follows:

"All the right, title and interest of the state of Washington in and to *so much of the beds and shores of any navigable river,* stream, waterway or watercourse located within the boundaries of any commercial waterway district

up to and including the line of ordinary high tide in waters where the tide ebbs and flows and up to and including the line of ordinary high water within the banks of any navigable rivers and lakes, *to the extent that the same, under any proceedings to be had under this act, shall cease to become part of such river,* stream, waterway or watercourse *by reason of the diversion of such river,* stream, waterway or watercourse, *under any proceedings had under this act, are hereby given and granted and vested* in the respective commercial waterway districts now existing, or hereafter to be formed, and the commissioners of such respective commercial waterway districts are hereby given the right, power and authority to sell such beds and shores. . . . " (Italics ours.)

The trial court adjudged that the waterway district was not entitled to any interest in the bed of Black river, but was entitled to all of the state's interest in the former bed of Cedar river, between the place where that river was diverted into a new channel by the district, and the old mouth of Cedar river where it emptied into Black river. The state takes no exception to that disposition made by the court.

The problem here presented for our consideration is partly one of fact, and partly one of statutory construction. It arises from this situation: Black river, as has been seen, originally drew its water from two sources, Lake Washington and Cedar river. The waterway district, acting within its authority, diverted the tributary river directly into the lake. At about the same time, the lake was lowered by the completion of the Federal government's Lake Washington canal project, so that, for all practical purposes, Black river ceased to flow.

The factual question is whether the watercourse of Black river dried up by reason of district "proceedings" for the diversion of *Black river*. Counsel for the intervener district has pointed out in argument that the trial court inadvertently erred in finding that Cedar river was diverted in 1911; and we must acknowledge this in view of the remark of this court in October, *1913,* that

" . . . the proposed waterway is about one and one-quarter miles long, and when constructed will divert and

carry all of the waters of Cedar river directly into Lake Washington a short distance east of where Black river flows out of that lake." *Commissioners Commercial Waterway Dist. No. 2 v. Seattle Factory Sites Co.,* 76 Wash. 181, 135 Pac. 1042.

In this connection, the intervener argues that if Lake Washington was lowered first, then the diversion of Cedar river was the proximate cause of the abandonment of the Black river channel. To this argument there are two answers. First: The testimony of old-time residents is that Cedar river was diverted *before* Lake Washington was lowered, and there is nothing to the contrary in the evidence. Second: We may concede that these events came close in point of time, and that priority in such a case is a technicality. Nonetheless, the diversion of the tributary and the lowering of the lake were concurrent causes of the stoppage of Black river; neither, alone, effected it.

Another contention of the intervener, as to the facts, is that its operations both in dredging Black river to increase the overflow from Lake Washington and in diverting Cedar river with the cognizance and approval of Federal engineers, were part of the "proceedings" to lower Lake Washington. These activities may have been in aid of the Federal project, but, after considering the meager evidence favorable to this view, we are persuaded that the trial court did not err in concluding that the waterway district had no part in the lowering of Lake Washington.

Corroborative of the trial court's conclusion is the fact that, at the time the diversion of Cedar river was under way, this same intervener justified its assessments against local property on the ground that its purpose was to create a navigable waterway for the benefit of Renton and the surrounding territory, and to relieve that area from flood conditions existing during high-water stages of Cedar river. *Commissioners Commercial Waterway Dist. No. 2 v. Seattle Factory Sites Co., supra.* Obviously, there could be no special benefit to the property within waterway district No. 2 if the diversion were for the purpose of contributing to the general project of lowering the lake.

The remaining question is whether the trial court properly construed Rem. Rev. Stat., § 9732, set out above.

The intervener's argument is to the following effect: Except for its operations, Black river would continue to be fed by the waters of Cedar river, and the channel of Black river would not otherwise be abandoned at the present time; hence, its activities at least contributed to the effective diversion of the waters of Black river; furthermore, the legislature was aware of the district's plans and of the small means of its sparse population when it drew the pertinent statute, and the legislature deliberately emphasized that commercial waterway districts should have title to beds and shores of navigable waters

". . . to the extent that the same, *under any proceedings to be had under this act*, shall cease to become part of such river, stream, waterway or watercourse by reason of the diversion of such river, stream, waterway or watercourse, *under any proceedings had* under this act. . . ." (Italics ours.)

The intervener urges that, particularly since it is a public body, this repeated phrase should be interpreted liberally, to the effect that, if a district's operations *contribute* to the diversion of state beds and shorelands, it should be vested with the state's title therein.

A reading of the chapter relating to commercial waterways, Rem. Rev. Stat., § 9724 [P.P.C. § 431-1] *et seq.*, discloses that the "proceedings" referred to therein relate to the powers of the commissioners to construct and maintain a system of commercial waterways; to straighten, widen, deepen, divert, alter, or otherwise change or improve rivers, watercourses, etc.; to construct needed ditches, canals, flumes, docks, and dykes necessary to protect land from overflow; to acquire needed rights of way; and to exercise the right of eminent domain. The purpose expressed is that the proposed waterways shall be conducive to the public health, sanitation, welfare, and convenience, shall increase the public revenue, and shall be of special benefit to the majority of the land included within the district's boundaries.

 Viewed in this context, Rem. Rev. Stat., § 9732, appears to have been designed to compensate commercial waterway districts in some measure for their expense in diverting waters from one course to another, in the public interest. This is borne out by the literal provision that such districts shall be vested with title to state-owned beds and shores *to the extent* that their activities or "proceedings" operate to uncover them.

In this case, we are confronted with the fact that the diversion of Cedar river only partially diminished the flow of Black river. We may say, parenthetically, that the evidence is vague on the degree of diminution. Certainly, there was nothing from which the trial court could in any event have ascertained, even approximately, the size of the Black river shores uncovered by the diversion of Cedar river.

As to the legislative intent asserted by the intervener, two features of the act indicate that the legislature did *not* deliberately choose language to provide the waterway district with a claim to the bed of Black river, if the district should divert Cedar river: (1) The act in terms requires that the waterway district divert, by proceedings under the act, the *same* river whose bed and shores it claims; and (2) the act does not expressly provide for cession to the waterway district of beds and shores uncovered by activities to which the district only *contributed.*

 Finally, in our opinion, the plea for liberal construction is not well taken. We believe that the act specifies, without ambiguity so far as this case is concerned, the extent to which beds and shores are vested in waterway districts, so that there is no occasion for interpretation.

We therefore hold that the trial court did not err in denying the claim of the intervener to the state's interest in the bed and shorelands of Black river.

Upon the whole case, we conclude that the appellant, Noel H. Ghione, is entitled to the land within the description of his deed, north to the southern line of ordinary high water of Cedar river as of the year it was diverted into its new course and west to the eastern line of ordinary

high water of Black river as of the year that river ceased to be navigable, such lines to be determined by the trial court from the best evidence in the case relevant to their location. Appellant is also entitled to damages for the reduction in value of his property when so determined. In other respects, we conclude that the judgment of the trial court is correct.

The judgment is reversed, and the cause will be remanded for further proceedings not inconsistent with the views herein expressed.

SIMPSON, CONNELLY, MALLERY, and SCHWELLENBACH, JJ., concur.

