# KER AND COMPANY *v.* COUDEN.

## ERROR TO THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 11.   Argued January 27, 1912.—Decided February 19, 1912.

The question of ownership under the Spanish law of accessions to the shore by accretion and alluvion has been a vexed one.

The Roman law is not like a deed or a modern code prepared *uno flatu*, but history has played à large part in its development.

Under the civil law, the seashore flowed by the tides, unlike the banks of rivers, was public property, belonging, in Spain, to the sovereign.

Under the Spanish Law of Waters of 1866, which became effective in the Philippines in 1871, lands added to the shore by accessions and accretions belong to the public domain unless and until the government shall decide they are no longer needed for public utilities and shall declare them to belong to the adjacent estates.

This rule applies not only to accessions to the shore while it is washed by the tide, but also to additions which actually become dry land.

The doctrine that accessions to the shore of the sea by accretion belong to the public domain and not to the adjacent estate has been adopted by the leading civil law countries, including France, Italy and Spain.

In determining what law is applicable to titles in the Philippines, this court deals with Spanish law as prevailing in the Philippines, and not with law which prevails in this country whether of mixed antecedents or the common law.

Where a case is brought up on an appeal on a single question, in regard to which there is no error, judgment below will be affirmed.

THE facts, which involve the title to land in the Philippine Islands formed by action of the sea, are stated in the opinion.

*Mr. Oscar Sutro,* with whom *Mr. E. S. Pillsbury, Mr. Aldis B. Browne, Mr. Alexander Britton* and *Mr. Evans Browne* were on the brief, for plaintiff in error:

The Supreme Court of the Philippines erred in holding

that the law, as written in the Partidas, declares that land above seashore formed by accretion from the sea belongs to the Crown and not to the riparian owner. Laws 3, 4, 6, 24, Tit. 28, 3d Partidas.

From the premise that the accessory follows the principal, the conclusion necessarily follows that, under the said Laws 3 and 4 of Title 28 of the Third Partida, the ownership of land, formed by accretion through the action of the sea, is in the riparian proprietor, after it has ceased to be washed by the tides.

From the express language of these definitions it appears that what is "shore" on the border of the sea during a particular year is to be determined by the high-water mark during that year, and that if the year following such particular year the high-water line has receded, then, at the end of such later year, the land between the high-water mark of the earlier year and the high-water mark of the later year is no longer "shore," for the waters have not covered it "when it rises its highest in all the year." And being then neither air, rain, water, sea nor shore, it does not "belong in common to all creatures," for, having expressly mentioned the particular things which "belong in common to all creatures," the lawmakers have thereby impliedly said that no other things than those enumerated "belong in common to all creatures." *Expressio unius est exclusio alterius. United States* v. *Arredondo*, 6 Pet. 691; *Sturges* v. *The Collector*, 12 Wall. 19; *Arthur* v. *Cumming*, 91 U. S. 362.

The "shore" at the civil law extended to that part of the land washed by the highest tides. *Galveston* v. *Menard*, 23 Texas, 349, 399; Hall Mexican Law, 448; Civil Code, Mexico, Art. 802.

Equally as at the common law, the shore, at civil law, was the line of high tide. *United States* v. *Pacheco*, 2 Wall. 587, 590.

The rule at common law, as under the Partidas, is

that the "shore" of the sea belongs to the Crown for the use of the public. But the rule at common. law is that accretions from the sea belong to the riparian owner. *Kent* v. *Yarborough*, 1 Dow. & Clark, 178; 3 Kent's Comm. 428; 2 Black. Comm. 262; *New Orleans* v. *United States*, 10 Pet. 662; *Saulet* v. *Shepherd*, 4 Wall. 502; *Banks* v. *Ogden*, 2 Wall. 57; *St. Clair* v. *Lovingston*, 23 Wall. 46; *Jefferis* v. *Omaha Land Co.*, 134 U. S. 178; *Shively* v. *Bowlby*, 152 U. S. 1.

The Law of Ports of 1880 superseded the Law of Waters of 1866.

. - It thus affirmatively appears from the Law of Waters and from the Law of Ports that the meaning of the term "shore," as used therein, is limited to the area actually being washed by the waters of the sea, and must be held that in the Partidas, the earlier statute, the word "shore" was used in the same sense; for it is a settled rule for the construction of statutes that where it appears from a later statute *in pari materia* that a term is therein used in a particular sense, then it is to be presumed that, in the earlier statute, such term was used in the same sense. *Alexander* v. *Alexandria*, 5 Cranch (U. S.), 1; *United States* v. *Freeman*, 3 How. 556; *Harrison* v. *Vose*, 9 How. 372; *Harris* v. *Runnels*, 12 How. 80; *Farmers' &c. Bank* v. *Dearing*, 91 U. S. 29.

When Laws 3 and 4 of Title 28 of the Third Partida and Laws 6 and 24 of the same title are considered together, the only inference that can be drawn therefrom is that accretions to the "shore" of the sea do not belong to the Crown, even if it be assumed that, as held by the courts below, the term "shore," as used in the Partidas, includes land at any previous time washed by the tides. *Hare* v. *Horton*, 5 Barn. and Ad. 160.

Under the rule that statutes, if doubtful, must receive a reasonable construction, it follows that, under the Partidas, the title to land formed by accretion on the

borders of the sea is not in the Crown, but is in the riparian proprietor. *Stephens* v. *Cherokee Nation,* 174 U. S. 445; *Beley* v. *Naphtaly,* 169 U. S. 353; *Chesapeake &c. R. Co.* v. *Miller,* 114 U. S. 176, 187.

All reason is against the said interpretation put upon the Partidas by the court. *New Orleans* v. *United States,* 10 Pet. 662, 717; *Jefferis* v. *Omaha Land Co.,* 134 U. S. 178, 192; 2 Black. Comm. 262; *Banks* v. *Ogden,* 2 Wall. 57, 67; *Lamprey* v. *Metcalf,* 52 Minnesota, 181.

Under the rule that, where a statute of one State is adopted by another, it is to be presumed that the interpretation placed upon the original statute is also adopted, and under the Partidas, accretions from the sea do not belong to the Crown, but belong to the riparian owner.

The laws of Spain, as embodied in the Partidas, were drawn largely from the Institutes of Justinian. Hannis Taylor, "Science of Jurisprudence," 162.

The interpretation placed upon the provisions of the Roman law by the writers upon that subject ought to be followed in construing a statute of a country which has adopted such statute from the civil law. *Viterbo* v. *Friedlander,* 120 U. S. 707; *Groves* v. *Sentell,* 153 U. S. 465; *Meyer* v. *Richards,* 163 U. S. 385; Lord Mackenzie's Roman Law, 177; Angell on Tide Waters, 2d ed. 249.

None of the authorities cited by the lower courts in support of their said conclusion lends any support thereto.

The authorities support the contention of the appellant that, under the Partidas, accretions formed by the action of the sea, when they become dry land, by reason of the recession of the high-water mark, belong to the riparian owner. Amandi, Civil Code, Vol. 2, p. 95; Scaevola, Commentary on Civil Code, Vol. 6, 338; Escriche, Dictionary of Law, p. 449.

Under the Law of Waters of 1866, which went into effect in the Philippines in September, 1871, title to lands

formed by accretion vested in the riparian proprietor, and not in the Crown.

This is the doctrine in Louisiana, where the civil law prevails. *Municipality No. 2* v. *Orleans Cotton Press*, 18 Louisiana, 122; *St. Clair County* v. *Lovingston*, 23 Wall. 46, cited with approval in *Nebraska* v. *Iowa*, 143 U. S. 369, and *Shively* v. *Bowlby*, 152 U. S. 1, and followed by the state courts in *Freeland* v. *Penn. R. Co.*, 197 Pa. St. 529, and *Knudson* v. *Omanson*, 10 Utah, 124.

The various provisions of the Law of Waters affirmatively show that the term "shore," as used in that law, includes land being swept by the tides, only, and that when, by reason of accretions, the high-tide line recedes from such land it thereupon ceases to be "shore." Articles 4, 8, 9 of the Law of Waters sustain the contention of plaintiff in error that under the express provisions of the Law of Waters, accretions from the sea, when they are no longer covered by the tides, belong to the riparian owner, and are not a part of the public domain.

The provisions of the Law of Ports of 1880 make it clear that Article 4 of the Law of Waters of 1866 does not have the effect of vesting title to accretions, which have become dry land, in the Government. *Alexander* v. *Alexandria*, 5 Cranch, 1.

The second sentence of Art. 4 of the Law of Waters constitutes a clear recognition of the fact that it was not intended that, under the said law, accretions which had become dry land by reason of the recession of the sea should belong to the Government.

If the lawmakers had intended that, under the Law of Waters, accretions from the sea should be a part of the public domain, even after they had become dry land, they would have said so, and would not have left the question to be settled by the uncertain result of litigation and judicial decision. *National Bank* v. *Matthews*, 98 U. S. 621, 627.

In a case like this, if there is any doubt or ambiguity in the Spanish law, the applicant should have the benefit of the doubt. *Cariño* v. *Insular Government*, 212 U. S. 449, 460.

*The Solicitor General* for defendant in error:

The land in controversy, having been formed from time to time since the year 1811, down to the present, by accession or accretion, occasioned by the action of the sea, became, as it was formed, a part of the public domain of Spain, and, as such, became, upon the acquisition by it of the Philippine Islands, a part of the public domain of the United States.

All agree that the law as to accretions prior to September 24, 1871, is to be found in the "Codigo de las Siete Partidas." "The Compilation of the Laws of the Kingdoms of the Indies" contained nothing upon the subject, but it was provided by those laws that where they were silent the laws of Castile should be applied both as to right and remedy.

The Partidas bearing upon the case, directly or indirectly, are: Law 1. What is meant by dominion, and how many kinds there are. Law 2. That there is a distinction between the things of this world; that some of them belong to all creatures living; and others not. Law 3. What the things are which belong in common to all creatures living. Law 4. Every man who chooses, may build a house or cabin upon the seashore, as a retreat; and he may erect there, any other edifice whatever, to serve his purposes; provided he does not thereby interfere with the use of the shore, which every one has a right in common to enjoy. He may also build vessels; stretch and mend his nets. Law 5. That he who finds gold, pearls or precious stones on the seashore, acquires the property of them. Law 6. That every one may make use of ports, rivers and public roads. Law 26. The in-

crease which a river makes by accretion to an estate belongs to him to whose estate it is carried, and he who lost it has no claim whatever to it. But not so if by avulsion. See 1 Moreau and Carleton's Partidas, ed. 1820, pp. 334 *et seq.*

In these laws there is a signal difference between the seashore and the river bank. The sea and its shore belong in common to all the living creatures of the world.

The Law of Waters of August 3, 1866, was promulgated, and became effective in the Philippines on September 24, 1871.

While differing from the Partidas in some details, it rests upon the same principle, that the seashore or beach is public property. See Arts. 1, 4, 8, 9, 10. By Art. 4 lands which attach themselves to the shore by accretions and deposits caused by the sea, are of public ownership.

Spanish commentators upon the law of Spain support the position of the Government. 2 Arrazola, Enciclopedia Española Derecho y Administracion, Madrid, 1849, pp. 580–583; 2 Gutierrez Fernandez, Treatise Codigos o Estudios Fundamentales, 86; 7 Alcubilla, Diccionario de la Administracion Española, ed. of 1887, 7, 108.

While Angell on Tide Waters sustains the law of accretions, as contended for by the plaintiffs, as the doctrine of the Roman, French, Spanish, and Louisiana jurisprudence, he is mistaken. See Art. 454 of the Civil Code of Italy, 1865; §§ 556–7, Code Napoleon; 2 Marcadé, Explication, du Code Napoléon, 5th ed., Vol 2, 439; Littré, in his French dictionary, *sub* "lais" as meaning in law "alluvian." Section 557, present Civil Code of France, Blackwood's translation; Digest of Civil Laws in force in 1808 in Orleans Territory, book 2, 106; and see *Zeller* v. *Yacht Club*, 34 La. Ann. 837.

The weight of authority is against the writers cited by plaintiffs in error, and there is absolutely no authority

to support the contention of plaintiffs as to accretions made since the Law of Waters of 1866 went into effect.

No Spanish authority questions the validity of either the Law of Waters of 1866 or the Law of Ports of 1880. The former owners themselves believed that the Law of Waters applied, that the State had the prior and paramount right to the land and could use it for a public purpose, and that the right of the adjacent owner attached only when the lands were to be put to private use.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is an action brought by Ker and Company to recover possession of land held by the defendant under a claim of title in the United States. The land is the present extremity of Sangley Point, in the Province of Cavite and island of Luzon, projecting into Manila Bay. It has been formed gradually by action of the sea; all of it since 1811, about three-quarters since 1856, and a part since 1871. For a long time the property was used by the Spanish Navy and it now is occupied by the present Government as a naval station, works costing more than half a million dollars having been erected upon it. The plaintiffs claim title under conveyances from the owner of the upland. The Philippine courts held that under the Partidas, III, Tit. 28, Laws 3, 4, 6, 24 and 26, and the Law of Waters of 1866, the title to the accretions remained in the Government, and the vexed question has been brought to this court.

That the question is a vexed one is shown not only by the different views of Spanish commentators but by the contrary provisions of modern codes and by the occasional intimations of the doctors of the Roman law. Justinian's Institutes, 2, 1, 20 (Gaius II. 70), followed by the Partidas, 3, 28, 26, give the alluvial increase of river banks to

the owner of the bank. If this is to be taken as an example illustrating a general principle there is an end of the matter. But the Roman law is not like a deed or a modern code prepared *uno flatu.* History plays too large a part to make it safe to generalize from a single passage in so easy a fashion. Alongside of the rule as to rivers we find that the right of alluvion is not recognized for lakes and ponds, D. 41, 1, 12, a rule often repeated in the civil law codes, *e. g.,* Philippine Civil Code of 1889, Arts. 366, 367; Code Napoleon, Art. 550. Italy, Civil Code, 1865, Art. 454. Mexico, Art. 797. If we are to generalize, the analogy of lakes to the sea is closer than that of rivers.—We find further that *In agris limitatis jus alluvionis locum non habet.* And the right of alluvion is denied for the *agrum manu captum,* which was *limitatum* in order that it might be known (exactly) what was granted. D. 41, 1, 16. The gloss of Accursius treats this as the reason for denying the *jus alluvionis.* If this reason again were generalized, it might lead to a contrary result from the passage in the Institutes. Grotius treats the whole matter as arbitrary, to be governed by local rules, and both the doctrine as to rivers and the distinction as to accurately bounded lands as rational enough. De Jure B. & P. Lib. 2, cap. 8, 11, 12. A respectable modern writer thinks that it was a mistake to preserve the passage concerning definitely bounded grants in the Digest, 1 Demangeat, Droit Romain, 2d ed. 441 ('antiquirt' Puchta, Pandekten, § 165), but so far as we have observed this is an exceptional view, and from the older commentators that we have examined down to the late brilliant and admirable work of Girard, Droit Romain, 4th ed. 324, this passage seems to be accepted as a part of the law. At all events it shows that, as we have said, it is unsafe to go much beyond what we find in the books. And to illustrate a little further the uncertainty as to the Roman doctrine we may add that Donellus mentions

the opinion that alluvion from the sea goes to the private owner only to remark that the texts cited do not support it, De Jur. Civ. IV, c. 27, 1 Opera (ed. 1828), 839 n., and treats the rule of the Institutes as peculiar to rivers, as also Vinnius in his comment on the passage stating the rule seems to do, while Huberus, on the other hand, thinks that rivers furnish the principle that ought to prevail. Praelectiones, II, Tit. 1, 34.

The seashore flowed by the tides, unlike the banks of rivers, was public property; in Spain belonging to the sovereign power. Inst. II, Tit. 1. 3, 4, 5. D. 43, 8, 3. Partidas, III, Tit. 28, 3, 4. And it is a somewhat different proposition from that laid down as to rivers if it should be held that a vested title is withdrawn by accessions to what was owned before. Perhaps a stronger argument could be based on the rule that the title to the river bed changes as the river changes its place. Part. III, Tit. 28. Law 31. Inst. 2. 2, 23. D. 41. 1; 7, 5. But we are less concerned with the theory than with precedent in a matter like this, whether we agree with Grotius or not in his general view. The Spanish commentators do not help us, as they go little beyond a naked statement one way or the other. It seems to us that the best evidence of the view prevailing in Spain is to be found in the codification which presumably embodies it. The Law of Waters of 1866, which became effective in the Philippines in September, 1871, and the validity of which we see no reason to doubt, after declaring like the Partidas that the shores (playas), or spaces alternately covered and uncovered by the sea, are part of the national domain and for public use, Arts. 1, 3, goes on thus: "Art. 4. The lands added to the shores by the accessions and accretions caused by the sea belong to the public domain. When they are not (longer) washed by the waters of the sea, and are not necessary for objects of public utility, nor for the establishment of special industries, nor for the

coast guard service, the Government shall [will?] declare them property of the adjacent estates, in increase of the same."

Notwithstanding the argument that this article is only a futile declaration concerning accessions to the shore while it remains such in a literal sense, that is, washed by the tide, we think it plain that it includes and principally means additions that turn the shore to dry land. These all remain subject to public ownership unless and until the Government shall decide that they are not needed for the purposes mentioned and shall declare them to belong to the adjacent estates. The later provision in Article 9, that the public easement for salvage, &c., shall advance and recede as the sea recedes or advances, simply determines that neither public nor private ownership shall exclude the customary public use from the new place. The Spanish Law of Ports of 1880, like the Law of Waters, asserts the title of the State although it confers private rights when there is no public need.

The presumption that the foregoing provisions of the Law of Waters express the understanding of the codifiers as to what the earlier law had been, becomes almost inexpugnable when we find that the other leading civil law countries have adopted the same doctrine. The Code Napoléon, after laying down the Roman rule for alluvion in rivers, Art. 556, 557, adds at the end of the latter Article: "Ce droit n'a pas lieu à l'égard des relais des la mer," which seems to have been adopted without controversy at the Conférence. See further Marcadé, Explication, 5th ed., vol. 2, p. 439. And compare 2 Hall's Am. Law Journal, 307, 324, 329, 333. The Civil Code of Italy, 1865, Art. 454, is to similar effect. See also, Chile, Civil Code, Art. 650. The Supreme Court of Louisiana in like manner confines the private acquisition of alluvion to rivers and running streams, and denies

the private right in the case of lakes and the sea. *Zeller* v. *Yacht Club*, 34 La. Ann. 837. And the provision of the Louisiana Code, Art. 510, is like those of France, Italy and Spain. The court of first instance below refers to judgments of the Supreme Court of Spain that seems to look in the same direction. We have neither heard nor found anything on the other side that seems to us to approach the foregoing considerations in weight, not to speak of the respect that we must feel for the concurrent opinion of both the courts below upon a matter of local law with which they are accustomed to deal. Of course we are dealing with the law of the Philippines, not with that which prevails in this country, whether of mixed antecedents or the common law.

As the case was brought up on the single question that we have discussed the judgment of the court below must be affirmed.

*Judgment affirmed.*

Mr. Justice McKenna, dissenting.

I cannot agree with the conclusion of the court. It seems to be conceded that it is not necessarily determined by the authorities which are cited. I think the better deduction from them is that they only declare the constant integrity of the shore, and the dominion of the government over it whether it recede or advance. When it ceases to be washed by the tides or the seas it becomes part of the upland and belongs to the owner of the upland. And this is but the application of the principle, said to be of natural justice, that he who loses by the encroachments of the sea should gain by its recession. *Banks* v. *Ogden*, 2 Wall. 57, 67.