## HUGHES *v.* WASHINGTON.

No. 15.   Argued November 6, 1967.—Decided December 11, 1967.

*Charles B. Welsh* argued the cause for petitioner. With him on the briefs was *John Gavin.*

*Harold T. Hartinger,* Assistant Attorney General of Washington, argued the cause for respondent.   With him on the brief were *John J. O'Connell,* Attorney General, and *J. R. Pritchard* and *John R. Miller,* Assistant Attorneys General.

*Assistant Attorney General Weisl* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Marshall, Robert S. Rifkind, Roger P. Marquis* and *George S. Swarth.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The question for decision is whether federal or state law controls the ownership of land, called accretion, grad-

ually deposited by the ocean on adjoining upland property conveyed by the United States prior to statehood. The circumstances that give rise to the question are these. Prior to 1889 all land in what is now the State of Washington was owned by the United States, except land that had been conveyed to private parties. At that time owners of property bordering the ocean, such as the predecessor in title of Mrs. Stella Hughes, the petitioner here, had under the common law a right to include within their lands any accretion gradually built up by the ocean.[1] Washington became a State in 1889, and Article 17 of the State's new constitution, as interpreted by its Supreme Court, denied the owners of ocean-front property in the State any further rights in accretion that might in the future be formed between their property and the ocean. This is a suit brought by Mrs. Hughes, the successor in title to the original federal grantee, against the State of Washington as owner of the tidelands to determine whether the right to future accretions which existed under federal law in 1889 was abolished by that provision of the Washington Constitution. The trial court upheld Mrs. Hughes' contention that the right to accretions remained subject to federal law, and that she was the owner of the accreted lands. The State Supreme Court reversed, holding that state law controlled and that the State owned these lands. 67 Wash. 2d 799, 410 P. 2d 20 (1966). We granted certiorari. 385 U. S. 1000 (1967). We hold that this question is governed by federal, not state, law and that under federal law Mrs. Hughes, who traces her title to a federal grant prior to statehood, is the owner of these accretions.

While the issue appears never to have been squarely presented to this Court before, we think the path to deci-

---

[1] *Jones* v. *Johnston,* 18 How. 150 (1856); *County of St. Clair* v. *Lovingston,* 23 Wall. 46 (1874).

sion is indicated by our holding in *Borax, Ltd.* v. *Los Angeles,* 296 U. S. 10 (1935). In that case we dealt with the rights of a California property owner who held under a federal patent, and in that instance, unlike the present case, the patent was issued after statehood. We held that

> "[t]he question as to the extent of this federal grant, that is, as to the limit of the land conveyed, or the boundary between the upland and the tideland, is necessarily a federal question. It is a question which concerns the validity and effect of an act done by the United States; it involves the ascertainment of the essential basis of a right asserted under federal law." 296 U. S., at 22.

No subsequent case in this Court has cast doubt on the principle announced in *Borax.* See also *United States* v. *Oregon,* 295 U. S. 1, 27–28 (1935). The State argues, and the court below held, however, that the *Borax* case should not be applied here because that case involved no question as to accretions. While this is true, the case did involve the question as to what rights were conveyed by the federal grant and decided that the extent of ownership under the federal grant is governed by federal law. This is as true whether doubt as to any boundary is based on a broad question as to the general definition of the shoreline or on a particularized problem relating to the ownership of accretion. See *United States* v. *Washington,* 294 F. 2d 830, 832 (C. A. 9th Cir. 1961), cert. denied, 369 U. S. 817 (1962). We therefore find no significant difference between *Borax* and the present case.

Recognizing the difficulty of distinguishing *Borax,* respondent urges us to reconsider it. *Borax* itself, as well as *United States* v. *Oregon, supra,* and many other cases, makes clear that a dispute over title to lands owned by the Federal Government is governed by federal law,

although of course the Federal Government may, if it desires, choose to select a state rule as the federal rule. *Borax* holds that there has been no such choice in this area, and we have no difficulty in concluding that *Borax* was correctly decided. The rule deals with waters that lap both the lands of the State and the boundaries of the international sea. This relationship, at this particular point of the marginal sea, is too close to the vital interest of the Nation in its own boundaries to allow it to be governed by any law but the "supreme Law of the Land."

This brings us to the question of what the federal rule is. The State has not attempted to argue that federal law gives it title to these accretions, and it seems clear to us that it could not. A long and unbroken line of decisions of this Court establishes that the grantee of land bounded by a body of navigable water acquires a right to any natural and gradual accretion formed along the shore. In *Jones* v. *Johnston,* 18 How. 150 (1856), a dispute between two parties owning land along Lake Michigan over the ownership of soil that had gradually been deposited along the shore, this Court held that "[l]and gained from the sea either by alluvion or dereliction, if the same be by little and little, by small and imperceptible degrees, belongs to the owner of the land adjoining." 18 How., at 156. The Court has repeatedly reaffirmed this rule, *County of St. Clair* v. *Lovingston,* 23 Wall. 46 (1874); *Jefferis* v. *East Omaha Land Co.,* 134 U. S. 178 (1890),[2] and the soundness of the principle is scarcely open to question. Any other rule would leave riparian owners continually in danger of losing the access to water which is often the most valuable feature of their property, and continually

[2] In *Ker & Co.* v. *Couden,* 223 U. S. 268 (1912), Mr. Justice Holmes, writing for the Court, held that under the governing Spanish law, lands added to the shore by accretion in the Philippines belonged to the public domain rather than to the adjacent estate.

vulnerable to harassing litigation challenging the location of the original water lines. While it is true that these riparian rights are to some extent insecure in any event, since they are subject to considerable control by the neighboring owner of the tideland,[3] this is insufficient reason to leave these valuable rights at the mercy of natural phenomena which may in no way affect the interests of the tideland owner. See *Stevens* v. *Arnold,* 262 U. S. 266, 269–270 (1923). We therefore hold that petitioner is entitled to the accretion that has been gradually formed along her property by the ocean.

The judgment below is reversed, and the case is remanded to the Supreme Court of Washington for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, concurring.

I fully agree that the extent of the 1866 federal grant to which Mrs. Hughes traces her ownership was originally measurable by federal common law, and that under the applicable federal rule her predecessor in title acquired the right to all accretions gradually built up by the sea. For me, however, that does not end the matter. For the Supreme Court of Washington decided in 1966, in the case now before us, that Washington terminated the

---

[3] It has been held that a State may, without paying compensation, deprive a riparian owner of his common-law right to utilize the flowing water, *St. Anthony Falls Water Power Co.* v. *Water Comm'rs,* 168 U. S. 349 (1897), or to build a wharf over the water, *Shively* v. *Bowlby,* 152 U. S. 1 (1894). It has also been held that the State may fill its tidelands and thus block the riparian owner's natural access to the water. *Port of Seattle* v. *Oregon & W. R. Co.,* 255 U. S. 56 (1921).

right to oceanfront accretions when it became a State in 1889. The State concedes that the federal grant in question conferred such a right prior to 1889. But the State purports to have reserved all post-1889 accretions for the public domain. Mrs. Hughes is entitled to the beach she claims in this case only if the State failed in its effort to abolish all private rights to seashore accretions.

Surely it must be conceded as a general proposition that the law of real property is, under our Constitution, left to the individual States to develop and administer. And surely Washington or any other State is free to make changes, either legislative or judicial, in its general rules of real property law, including the rules governing the property rights of riparian owners. Nor are riparian owners who derive their title from the United States somehow immune from the changing impact of these general state rules. *Joy* v. *St. Louis,* 201 U. S. 332, 342. For if they were, then the property law of a State like Washington, carved entirely out of federal territory, would be forever frozen into the mold it occupied on the date of the State's admission to the Union. It follows that Mrs. Hughes cannot claim immunity from changes in the property law of Washington simply because her title derives from a federal grant. Like any other property owner, however, Mrs. Hughes may insist, quite apart from the federal origin of her title, that the State not take her land without just compensation. *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 236–241.

Accordingly, if Article 17 of the Washington Constitution had unambiguously provided, in 1889, that all accretions along the Washington coast from that day forward would belong to the State rather than to private riparian owners, this case would present two questions not discussed by the Court, both of which I think exceedingly difficult. First: Does such a prospective change in state

property law constitute a compensable taking?   Second: If so, does the constitutional right to compensation run with the land, so as to give not only the 1889 owner, but also his successors—including Mrs. Hughes—a valid claim against the State?

The fact, however, is that Article 17 contained no such unambiguous provision.  In that Article, the State simply asserted its ownership of "the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes."   In the present case the Supreme Court of Washington held that, by this 1889 language, "[l]ittoral rights of upland owners were terminated."   67 Wash. 2d 799, 816, 410 P. 2d 20, 29.  Such a conclusion by the State's highest court on a question of state law would ordinarily bind this Court, but here the state and federal questions are inextricably intertwined.   For if it cannot reasonably be said that the littoral rights of upland owners were terminated in 1889, then the effect of the decision now before us is to take from these owners, without compensation, land deposited by the Pacific Ocean from 1889 to 1966.

We cannot resolve the federal question whether there has been such a taking without first making a determination of our own as to who owned the seashore accretions between 1889 and 1966.   To the extent that the decision of the Supreme Court of Washington on that issue arguably conforms to reasonable expectations, we must of course accept it as conclusive.   But to the extent that it constitutes a sudden change in state law, unpredictable in terms of the relevant precedents, no such deference would be appropriate.   For a State cannot be permitted to defeat the constitutional prohibition against taking property without due process of law by the simple

device of asserting retroactively that the property it has taken never existed at all. Whether the decision here worked an unpredictable change in state law thus inevitably presents a federal question for the determination of this Court. See *Demorest* v. *City Bank Co.,* 321 U. S. 36, 42–43. Cf. *Indiana ex rel. Anderson* v. *Brand,* 303 U. S. 95. The Washington court insisted that its decision was "not startling." 67 Wash. 2d 799, 814, 410 P. 2d 20, 28. What is at issue here is the accuracy of that characterization.

The state court rested its result upon *Eisenbach* v. *Hatfield,* 2 Wash. 236, 26 P. 539, but that decision involved only the relative rights of the State and the upland owner in the tidelands themselves. The *Eisenbach* court declined to resolve the accretions question presented here. This question was resolved in 1946, in *Ghione* v. *State,* 26 Wash. 2d 635, 175 P. 2d 955. There the State asserted, as it does here, that Article 17 operated to deprive private riparian owners of post-1889 accretions. The Washington Supreme Court rejected that assertion in *Ghione* and held that, after 1889 as before, title to gradual accretions under Washington law vested in the owner of the adjoining land. In the present case, 20 years after its *Ghione* decision, the Washington Supreme Court reached a different conclusion. The state court in this case sought to distinguish *Ghione:* The water there involved was part of a river. But the *Ghione* court had emphatically stated that the same "rule of accretion . . . applies to both tidewaters and fresh waters." 26 Wash. 2d 635, 645, 175 P. 2d 955, 961. I can only conclude, as did the dissenting judge below, that the state court's most recent construction of Article 17 effected an unforeseeable change in Washington property law as expounded by the State Supreme Court.

There can be little doubt about the impact of that change upon Mrs. Hughes: The beach she had every

reason to regard as hers was declared by the state court to be in the public domain. Of course the court did not conceive of this action as a taking. As is so often the case when a State exercises its power to make law, or to regulate, or to pursue a public project, pre-existing property interests were impaired here without any calculated decision to deprive anyone of what he once owned. But the Constitution measures a taking of property not by what a State says, or by what it intends, but by what it *does*. Although the State in this case made no attempt to take the accreted lands by eminent domain, it achieved the same result by effecting a retroactive transformation of private into public property—without paying for the privilege of doing so. Because the Due Process Clause of the Fourteenth Amendment forbids such confiscation by a State, no less through its courts than through its legislature, and no less when a taking is unintended than when it is deliberate, I join in reversing the judgment.