593 F.2d 982
 Theron S. SMITH, Jesse Helzer and Violet Elma Helzer,
husband and wife, and Amoco Production Company,
Plaintiffs-Appellants-Cross-Appellees,
v.
UNITED STATES of America, Defendant-Appellee-Cross-Appellant,
and
J. P. Stephenson, Elmer M. Novak, the Charles and Els
Bendheim Foundation, Inc., Gertrude Jo Myers,
Executrix of the Estate of Louis P.
Myers, Deceased, and the Termo
Company, Defendants-Appellees.
 Nos. 77-1214, 77-1215.
 United States Court of Appeals,
Tenth Circuit.
 Submitted June 26, 1978.
Decided March 13, 1979.
 
 Bryce L. Hodgden of Hieronymus, Hodgden & Halley, Woodward, Okl., and Frank W. Wewerka, Amoco Products Company, Denver, Colo., for plaintiffs-appellants-cross-appellees.
 E. Blumhagen, Watonga, Okl., for defendant-appellee J. P. Stephenson.
 C. Harold Thweatt of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., for defendant-appellee The Termo Co.
 James W. Moorman, Acting Asst. Atty. Gen., George R. Hyde and Glen R. Goodsell, Dept. of Justice, Washington, D. C., and John E. Green, U. S. Atty., Oklahoma City, Okl., for defendant-appellee-cross-appellant United States of America.
 Before SETH, Chief Judge, and DOYLE and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Plaintiffs-appellants Theron S. Smith, Jesse Helzer and Violet Elma Helzer, who own land on the west bank of the South Canadian River in Dewey County, Oklahoma, filed a suit in federal court to quiet title to surface and mineral rights in 147.12 acres of land on the east side of the river. Jurisdiction is based upon 28 U.S.C. § 2409a, since the United States is named a defendant and claims title to the surface and mineral rights of the tract. J. P. Stephenson claims to own the surface rights of the land. Amoco Production Company became a party because it has a mineral lease on the tract if it is owned by Smith and the Helzers. The Termo Company has an oil and gas lease from the United States on portions of the disputed acreage and is operating a producing natural gas well on the property. The other defendants named in the action did not appear because their only interests are in lands contiguous to the contested parcels.
 
 
 2
 The principal factual issue before the trial judge was whether the 147.12 acres were added to the east side of the South Canadian River by accretion or avulsion. After hearing a number of witnesses and considering aerial photographs taken through the years, the court declared that "there's just no doubt in the world about it in my mind, and I have no difficulty at all in determining that these changes were brought about by accretion rather than avulsion." He therefore sustained a summary judgment motion by the United States and the Termo Company to quiet title to the mineral rights in the acreage against all other parties.
 
 
 3
 On the question of ownership of the surface rights, however, the court ruled that they belonged to Stephenson and not to the United States. The United States had originally owned lots 2 and 4, according to an 1874 survey, which at that time abutted the east bank of the South Canadian River and contained approximately 37.08 acres. In 1966 the United States sold these lots to Stephenson, reserving oil, gas, potash and sodium mineral rights, but gave a patent to the two lots, described as containing 37.08 acres. The court held that Stephenson's purchase gave him the surface rights to the additional 147.12 acres, most of which had been added by accretion to the two lots prior to 1966.
 
 
 4
 One question on appeal is whether there is substantial evidence to support the trial court's finding on accretion. The United States has cross-appealed the court's conclusion that Stephenson is entitled to the ownership of the surface rights in the property.
 
 
 5
 * There are differences between the parties as to whether federal or Oklahoma law applies to this case, in view of the fact that at least the mineral rights to lots 2 and 4 involved here have always been owned by the United States. See Wilcox v. Jackson, 38 U.S. (13 Peters) 498, 10 L.Ed. 264 (1839). The record demonstrates the trial judge perceived no difference between federal and Oklahoma law as it affected the accretion-avulsion fact issue. We agree. See Stone v. McFarlin, 249 F.2d 54 (10th Cir. 1957); Olsen v. Jones, 412 P.2d 162 (Okl.1966); Okl.Stat.Ann. tit. 60, §§ 335-336 (West 1971). We must uphold the trial court's finding on this issue unless it is clearly erroneous. Fed.R.Civ.P. 52(a).
 
 
 6
 Bauman v. Choctaw-Chickasaw Nations, 333 F.2d 785, 789 (10th Cir. 1964) states the difference between the two doctrines as follows:
 
 
 7
 "Accretion" denotes the process by which the area of owned land is increased by the gradual deposit of soil due to the action of a bounding river or other body of water. Accretion occurs when the change in the river is gradual and imperceptible. The gradualness of the process distinguishes accretion from the more rapid, easily perceived, and sometimes violent, shifts of land incident to floods, storms or channel breakthroughs known as "avulsion." A sudden change in the channel of a river, as occurs in the case of avulsion, does not affect title to the lands thus transferred from one side of the river to the other. (Footnotes omitted.)
 
 
 8
 The plaintiffs' evidence consisted of testimony by individuals who had lived near the South Canadian River for many years. Their evidence focused on several dates from 1904 through the 1950's when the river was at a high water or flood stage. Witnesses testified about observing large chunks of soil break off into the river and float away in the rapid waters. One witness recalled several times in the 1930's and 1940's when what he considered to be floods caused the river to move in and out of its banks. This witness said, "there was so much change in it; it never remained the same." And after 1940 "there really wasn't any certain channel . . . ; it was all over," while at other times "there was no water at all." Plaintiffs' witnesses recalled a number of times when they considered the waters to be in a flood stage, although a university professor, Richard DeVries, testifying as an expert witness for the defense, stated that there were only two official floods recorded on the river, as measured at stations some distance from the tract, one in 1904 and one in 1937. DeVries said that the South Canadian was a "braided" river with no single identifiable channel but instead several small channels that would "braid" around each other as they worked their way through the sandy river bottom soil. This witness and another gave opinion testimony that the additions to the east side of the river were definitely imperceptible at any single point in time and were caused by accretion, not avulsion.
 
 
 9
 We believe the aerial photographs of the area taken at various times from 1941 through 1976, introduced into evidence, graphically support the court's finding that the additions were by a slow process of growth on the east bank of the river, as the river channel deposited sand and silt along its banks. There was evidence that the soil gradually firmed until trees and other vegetation grew in relative abundance. Two dams and reservoirs built upstream in the 1960's now substantially reduce the likelihood of flooding and unpredictable high water on this river, and decrease the risk of further shifting. From the photographs it appears that a narrower and deeper channel has developed or the river now carries less water in normal times. What would be regarded as riverbed has definitely diminished through the years.
 
 
 10
 Even the testimony most favorable to the plaintiffs only substantiates the suddenness of high water on several occasions and the gradual erosion of land from the west bank. No one particular flood or other sudden or violent force separated plaintiffs' land and deposited it on the other side. We therefore affirm the trial court's finding that the change was due to accretion and not to avulsion, and its conclusion that the mineral rights under the 147.12 acres properly belong to the United States, thus validating Termo's oil and gas lease with respect to this tract.
 
 II
 
 11
 Resolving the dispute over title to the surface rights is more difficult. Since most of the 147.12 acres accreted to lots 2 and 4 prior to 1966, they are owned by the United States unless they were conveyed to Stephenson. Federal law controls the determination of whether these lands were transferred by the patent to Stephenson. Hughes v. Washington, 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967).
 
 
 12
 It has long been recognized that where the government has conveyed land by reference to a plat, and one of the boundaries is the meanderings of a river or other body of water, accretions which occur after the entry by the conveyee accrue to the benefit of the landowner. Jones v. Johnston, 59 U.S. (18 How.) 150, 15 L.Ed. 320 (1856); Jefferis v. East Omaha Land Co.,134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872 (1890); Hughes v. Washington, 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967). The rationale for this rule is that if land bounds upon a river (or other body of water) it is subject to loss by erosion, and hence should be entitled to the gain which accrues by accretion. Also, access to water is often the most valuable feature of the property and what was water frontage property when received should continue to have that benefit. Further, a different rule would subject the landowner to continuous harassing litigation challenging the location of the original water line. Id. at 293-94, 88 S.Ct. 438.
 
 
 13
 Does the same reasoning apply when the accretion has occurred prior to the entry of the patentee? If a landowner has, by accretion, acquired additional acreage and then makes a conveyance it is, in the first instance, a matter of the intention between the parties as to what the grantee takes. If the document is plain in stating whether the accretions pass, then the intent should be given full effect. See Jones v. Johnson, supra. Where nothing is expressly stated relating to the accretions, then some rule of construction, presumption or policy must be relied upon to resolve the question.
 
 
 14
 In the instant case the 1966 conveyance to Stephenson was by typewritten reference to "Sec. 33, Lots 2 and 4. The area described contains 37.08 acres," followed by a printed "according to the official plat of the survey of the said land, on file in the Bureau of Land Management." That survey referred to lines which were stated to be the meanders of the left bank of the Canadian River. The bid form under which Stephenson purchased also referred to lot numbers, acreage, and an appraised value of $150 for lot 2 and $425 for lot 4, the exact prices Stephenson bid and paid.
 
 
 15
 On these facts should Stephenson take the surface rights to the accreted 147.12 acres? It is an accepted rule of construction that where land is described by lot number only, if bounded by a river, "which is a shifting line and may gradually and imperceptibly change, (it) is just as fixed a boundary in the eye of the law as a permanent object, such as a street or a wall." Jefferis v. East Omaha Land Co., 134 U.S. 178, 196, 10 S.Ct. 518, 523, 33 L.Ed. 872 (1890). The cases also recognize that boundary references to natural monuments or objects will control over references to courses and distances. These rules are founded on the "presumed intention of the parties." Security Land & Exploration Co. v. Burns, 193 U.S. 167, 179, 24 S.Ct. 425, 48 L.Ed. 662 (1904).
 
 
 16
 The United States claims there is an exception to these rules, that the river's meander line as described in the plat will be considered the boundary, and not the river itself, if substantial lands have formed by accretion between the original survey line and the river prior to the date of transfer. See Wittmayer v. United States, 118 F.2d 808 (9th Cir. 1941); Granger v. Swart, 10 Fed.Cas. 961, (C.C.D.Wisc.1875) (No. 5,685); United States v. Eldredge, 33 F.Supp. 337 (D.Mont.1940); and Mecca Land & Exploration Co. v. Schlecht, 4 F.2d 256 (D.Ariz.1925). Two of these cases involve homestead entries upon public lands after accretions had occurred, and perhaps all may be factually distinguished from the instant case. But they clearly recognize the general exception urged upon us. United States v. 11,993.32 Acres of Land, 116 F.Supp. 671 (D.N.D.1953), on the other hand, expressly repudiates this exception.
 
 
 17
 The trial court holding for Stephenson relied principally upon Jefferis v. East Omaha Land Co., 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872 (1890). That case involved a survey made in 1851, an entry under patent in 1853, and a conveyance by the patentee in 1856. By the time the litigation commenced in 1889 there was an addition of some 40 acres to an original tract of 37.24 acres. The court noted the accretion had occurred "so slowly that it could not be observed in its progress" but that each three or four months "it could be discerned by the eye that additions greater or less had been made to the shore." 134 U.S. at 182, 10 S.Ct. at 519. It appeared to assume some accretion had occurred between the date of survey and the entry:
 
 
 18
 How much, if any of it, was formed between the date of the original survey in 1851 and the time of the entry in October, 1853, cannot be told; nor how much was formed between 1853 and 1856, while the patentee owned the lot . . .
 
 
 19
 134 U.S. at 191, 10 S.Ct. at 521. It expressly found that nothing was reserved to the United States:
 
 
 20
 It is a familiar rule of law that, where a plat is referred to in a deed as containing a description of land, the courses, distances and other particulars appearing upon the plat are to be as much regarded, in ascertaining the true description of the land and the intent of the parties, as if they had been expressly enumerated in the deed. Fox v. Union Sugar Refinery, 109 Mass. 292. This rule is applicable to government lands bounded by the Missouri River, as the same are surveyed and platted under the Acts of Congress; and the patent passed the title of the United States to lot 4, not only as it was at the time of the survey in 1851, but as it was at the date of the patent in 1855, so that the United States did not retain any interest in any accretion formed between the survey in 1851 and the date of the patent. . . .
 
 
 21
 134 U.S. at 194-95, 10 S.Ct. at 522. Thus the case is supportive, on its face, of the trial court's ruling that Stephenson took title to the accreted lands.
 
 
 22
 The United States' contention, however, is that where there was a Substantial accretion prior to the entry of the patentee a different rule applies. Supreme Court decisions subsequent to Jefferis are said to support this proposition. These include Horne v. Smith, 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68 (1895); Niles v. Cedar Point Club, 175 U.S. 300, 20 S.Ct. 124, 44 L.Ed. 171 (1899); Security Land & Exploration Co. v. Burns, 193 U.S. 167, 24 S.Ct. 425, 48 L.Ed. 662 (1904); and Gleason v. White, 199 U.S. 54, 25 S.Ct. 782, 50 L.Ed. 87 (1905). United States v. 11,993.32 Acres of Land, supra, distinguishes these cases as being within another well-recognized exception: if there was fraud or mistake in the original survey, which omitted a substantial amount of land between the survey meander line and the actual shore described, then the meander line set forth in the survey will be considered the boundary rather than the actual shore. See Jeems Bayou Fishing & Hunting Club v. United States, 260 U.S. 561, 43 S.Ct. 205, 67 L.Ed. 402 (1923).
 
 
 23
 It is true that in Horne v. Smith a surveyor unaccountably left out a tract of land between a bayou and the river consisting of several hundred acres. In Niles the surveyor stopped at what he thought was an impassable marsh and water, but he had apparently made the survey at a time of unusually high water, and the land was not as it appeared. There was apparently fraud on the part of the surveyor whose work was involved in Security Land & Exploration Co. There were conflicting surveys and a conveyance which referenced the wrong survey in Gleason v. White, supra.
 
 
 24
 Still, a reading of those decisions convinces us that the United States Supreme Court has gone beyond the situation involved in Jeems and recognized a broader exception which would be applicable to the instant case. Whether the basis is a theory of unjust enrichment, strict construction or one of presumed intent is uncertain, but nonetheless it exists. Niles v. Cedar Point Club, 175 U.S. at 306, 20 S.Ct. at 127 contains the following comment:
 
 
 25
 It may be that surveyor Rice erred in not extending his surveys into this marsh, but his error does not enlarge the title conveyed by the patents to the surveyed fractional sections. The United States sold only the fractional sections, received only pay therefor, an amount fixed by the number of acres conveyed, and one receiving a patent will not ordinarily be heard to insist that by reason of an error on the part of the surveyor more land was bought than was paid for, or than the government was offering for sale. . . .
 
 
 26
 In Security Land & Exploration Co. v. Burns, 193 U.S. at 180, 24 S.Ct. at 428 it is said:
 
 
 27
 The patents mention the number of acres contained in each lot, and that number is stated in the 11th finding of the trial judge, which is set forth in the foregoing statement of facts. The difference between the number of acres stated in the patents to be in each lot and the number now claimed by the plaintiff in error is very large, and is subsequently referred to herein. It seems plain that the intention was to convey no more than the number of acres actually surveyed and mentioned in the patents. In Ainsa's Case, 161 U.S. 208, 16 S.Ct. 544, 40 L.Ed. 673, this is deemed to be a very important, and sometimes a decisive, fact. . . .
 
 
 28
 In Gleason v. White, 199 U.S. at 61-62, 25 S.Ct. at 784, the court states:
 
 
 29
 It does not seem that he (the patentee) could have been mistaken as to the land that he was acquiring from the government, for he must have lived on it five years in order to have perfected his homestead. . . . To give him twice that amount of land would be enabling him to profit by a mistake of the government, a mistake of which he was cognizant . . .
 
 
 30
 In an analogous case to the one before us where omitted land was three times the described acreage we recognized the "substantial omission" exception or test. Walton v. United States, 415 F.2d 121 (10th Cir. 1969). See also, Snake River Ranch v. United States, 542 F.2d 555 (10th Cir. 1976). We also said, "In a public grant nothing passes by implication and, unless the grant is clear and explicit regarding the property conveyed, a construction will be adopted which favors the sovereign rather than the grantee." Walton v. United States, supra, at 123.
 
 
 31
 We ought not hold a conveyance described as 37.08 acres and priced on that basis conveyed nearly four times that amount of additional land, unless there is a compelling reason. Since most of the accretion occurred prior to the date of the conveyance, it does not seem reasonable to assume the purchaser could have thought he was receiving 184 plus acres when the government bid form listed only 37.08 acres. This does not appear to be a situation where having the waterfront was important in the bidding and purchase. We are concerned that frequent title disputes could arise if relatively small accretions are held not to pass to one in Stephenson's position. But we will not hold the acreage is excepted from the grant unless the accretion is Substantial, of the level of unjust enrichment, and a situation where it seems obvious the government would have acted differently had it realized the error. See Snake River Ranch v. United States, supra, at 557. Thus we hold the accreted land should have been treated as unplatted and unsurveyed public lands, and the trial court erred in its determination that Stephenson was the owner rather than the United States.
 
 
 32
 We affirm the trial court's decision on the accretion issue, but hold that the United States owned not only the mineral rights but the surface rights to the entire 147.12 acres.